JERRY BARROWS

v.

RALPH BOLES & a.

BARCO DEVELOPMENT CORPORATION

v.

RALPH BOLES & a.

November 7, 1996

*Nighswander, Martin & Mitchell*, of Lebanon (*R. Peter Decato* on the brief and orally), for plaintiff Jerry Barrows.

Barco Development Corporation filed no brief.

Richard B. Laschever, by brief, *pro se.*

Jerome Diamond joins in the brief of Richard B. Laschever, and orally, *pro se.*

Ralph Boles, Irene Boles, Raymond Factor, Doris Factor, Arnold Bernstein, Claire Tamkin, Robert Cohen, Bernard Shectman, Mike Donza, Hamilton Krans, Edna Krans, Gene Lavigne, and Albert Lavigne, all of whom appear *pro se*, join in the brief of Richard B. Laschever.

J.J. Bosco Cardoza filed no brief.

HORTON, J. This appeal arises in the context of a complex procedural scenario, and involves issues of lender liability, contract, and bankruptcy. An extensive recitation of the factual and procedural background of this case is necessary for our disposition of the issues on appeal. We affirm.

*I. Facts and Procedure*

Jerry Barrows, one of the plaintiffs in this action, owned several adjacent parcels of land in Winchester, including a mobile home park, a 0.3-acre parcel on which he built his office (Lot I), and a six-acre piece of unimproved land (Lot II). In 1988, Barrows was involved in developing a condominium project on land abutting the mobile home park. When Barrows sought financing for the project, he was introduced to Richard Laschever, a Connecticut lawyer and one of the defendants in this case. Laschever acted as a finder and attorney for investors interested in providing financing for Barrows' project. Laschever assembled a group of fourteen investors, ostensibly led by Jerome Diamond, and collectively known as "the Diamond Group." Diamond, Laschever, and two investors, Ralph M. Boles and Arnold Bernstein, were the only active participants in negotiations with Barrows. The other defendants, Irene B. Boles, Raymond Factor, Doris Factor, Claire Tamkin, Robert Cohen, Bernard Shectman, Mike Donza, Gene Lavigne, Hamilton Krans, Edna Krans, J.J. Bosco Cardoza, and Albert Lavigne, were simply passive investors with no personal knowledge of the negotiations with Barrows.

Laschever arrived at a tentative financing proposal with Barrows in early September 1988. When Laschever approached the Diamond Group with this proposal they sought more favorable terms. On September 20, 1988, Diamond, Laschever, Boles, Bernstein, and Barrows met to finalize the details of the financing proposal and to

close the loan. The parties entered into a written agreement (the September 20 agreement) in which Barrows received $650,000 at closing and would receive an additional $100,000 after completion of a model, consisting of three condominium units (the triplex), to be shown to prospective purchasers. The agreement provided for eighteen percent interest on the loan with six points to be paid at closing. Additionally, the Diamond Group received a first mortgage on Lots I and II, a second mortgage on the adjacent mobile home park, and a second mortgage on another park which Barrows owned. The agreement also provided that the Diamond Group would subordinate its interest in Lot I to a $200,000 mortgage to a financial institution after Barrows had repaid $70,000. On September 20, 1990, Barrows was scheduled to repay the entire $750,000 principal balance.

After the triplex was placed on the foundation, Barrows requested the remaining $100,000, but Diamond refused, insisting that the money would not be forthcoming until the model was complete. In order to resolve this dispute, the parties modified their September 20 agreement on November 28, 1988. As part of the November 28 agreement, the Diamond Group agreed to subordinate their mortgage on Lot I to a new $230,000 mortgage on that lot in favor of Barco Development Corporation (Barco), a corporation wholly owned and controlled by Barrows. In exchange, Diamond was relieved of its obligation to disburse the final $100,000 under the September 20 agreement. Barrows' intention was to borrow $230,000 from another lender and use Barco's mortgage as security.

Between December 1988 and February 1989, Barrows made no interest payments under the September 20 agreement, and in March 1989, the Diamond Group notified Barrows that they would foreclose on their mortgages unless Barrows brought his payments up to date. Barrows made the December 1988 payment in March 1989. At the same time, Barrows was negotiating with the Money Store for a $104,000 loan, but the Money Store would not accept Barco's $230,000 mortgage as security. As a result, Barrows and the Diamond Group again modified the agreement. The Diamond Group agreed to subordinate its mortgage on Lot I to a $104,000 mortgage from Barrows to the Money Store. Barrows gave the Diamond Group a discharge of Barco's $230,000 mortgage, which Laschever was instructed to hold in escrow until Barco received a new $130,000 mortgage and the Diamond Group provided a subordination agreement in Barco's favor. Barrows agreed to use approximately $30,000 of the Money Store proceeds to bring his payments under the September 20 agreement up to date. The Diamond Group agreed to

forbear from foreclosing on the mortgages under the September 20 agreement. Finally, the Diamond Group agreed to subordinate all of their mortgages to a $1,750,000 construction loan on terms acceptable to them when Barrows obtained the construction loan.

The Diamond Group provided the subordination agreement to the Money Store, but Barrows failed to pay the arrearage under the September 20 agreement from the proceeds of the Money Store loan. Laschever, on the other hand, filed the discharge of the $230,000 Barco mortgage without the $130,000 mortgage in Barco's favor being in place. On May 24, 1989, the parties again entered into negotiations to solve their differences. Under the May 24 agreement, instead of subordinating its mortgages to a $1.75 million construction loan, the Diamond Group agreed to lend Barrows up to $500,000: $250,000 at eighteen percent interest and ten points to be disbursed at the June 1 closing, and additional advances of up to $250,000 to be made at the sole discretion of the lenders. The Diamond Group immediately provided Barrows with $100,000, in exchange for which Barrows agreed to waive any claim against the Diamond Group for its failure to disburse $100,000 under the September 20 agreement. At the June 1 closing, Barrows refused to sign the promissory note because it called for him to pay $500,000 within sixty days. Relations between the parties deteriorated further, and on October 20, 1989, the Diamond Group issued a notice of foreclosure to Barrows under the mortgages granted pursuant to the September 20 agreement.

On October 30, 1989, Barrows filed a petition for injunctive and other relief to prevent the defendants from foreclosing. Barrows' petition also sought damages, alleging: (1) that the defendants breached the September 20 agreement; (2) that the defendants breached the May 24 agreement; (3) that the defendants breached their agreement in March 1989 that they would subordinate their $650,000 mortgages to a $1,750,000 mortgage; (4) that the defendants intentionally interfered with Barrows' contractual relations with his tenants by sending a letter to the tenants before the foreclosure sale was finalized; (5) that the defendants acted fraudulently in inducing Barrows to enter into the September 20 and May 24 agreements; and (6) that the defendants' acts violated the Consumer Protection Act, RSA chapter 358-A.

On November 14, 1989, the Superior Court (*Mangones*, J.) granted a temporary restraining order (TRO) on the condition that Barrows post a $25,500 bond and ordered that a hearing on the merits would be held within sixty days. On November 17, 1989, the court ordered the amount of the bond to be increased by $6,000. On

January 6, 1990, the court vacated the TRO and denied Barrows' request for a preliminary injunction. The court subsequently denied Barrows' motion for reconsideration. In December 1992, the court refused to release the bond, ordering that it be held to cover damages incurred by the Diamond Group as a result of the TRO.

On January 19, 1990, Barrows filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire. The defendants' foreclosure of Barrows' property was automatically stayed pursuant to 11 U.S.C. § 362(a) (1988) (amended 1994). On May 17, 1990, however, the bankruptcy court granted the defendants' request for relief from the stay. Barco then filed suit against the defendants in superior court seeking specific performance to force the defendants to subordinate their mortgage in Lot I to Barco's $130,000 mortgage. The defendants were allowed by the bankruptcy court to go forward with the foreclosure sale, which took place on June 22, 1990. In September 1991, Barrows, on behalf of Barco, filed a motion for *ex parte* attachment of the proceeds of the foreclosure sale. This motion was denied without explanation by the superior court. The defendants subsequently counterclaimed against Barrows for the deficiency owed by him under the parties' agreements.

In July 1990, Barrows' Chapter 11 bankruptcy petition was converted to a Chapter 7 petition, and Dennis Bezanson was appointed bankruptcy trustee for the estate of Barrows. Barrows and the defendants subsequently filed a joint motion to lift the automatic stay on the State court lawsuit and allow the case to go to trial. In that motion, both parties requested that any judgment be treated as an unsecured pre-petition claim. In December 1990, the bankruptcy court granted the joint motion. The trustee assented to this motion. Prior to trial, the trustee did not move to join the State court action; nor did any of the parties join the trustee or the estate.

The lawsuit filed by Barrows and the suit filed by Barco were consolidated, and these claims, together with the defendants' counterclaim against Barrows, were tried on the merits during June and July 1991. At trial, all of the parties proceeded *pro se*. The only defendants physically present during the proceedings were Diamond, Laschever, Ralph Boles, and Bernstein. Barco also was not represented by an attorney at trial. On January 27, 1992, the Superior Court (*Hollman*, J.) issued its findings and order, denying the plaintiffs' relief on all grounds and granting the defendants' counterclaim in the amount of $569,152.

On January 16, 1992, the bankruptcy court approved the trustee's request that R. Peter Decato be appointed as special counsel to

represent the trustee of the estate of Barrows. On February 7, 1992, Barrows moved to reconsider the trial court's final order on the merits. The trustee moved to intervene on behalf of the bankruptcy estate and moved for reconsideration on the estate's behalf. The trial court allowed the trustee's motion to intervene for the purpose of arguing the motion to reconsider but denied both the trustee's and Barrows' motions for reconsideration. The trustee then appealed on numerous grounds to this court. After we accepted the trustee's appeal, but before oral argument, the successor trustee, Joseph Braunstein, abandoned all interest in the claims at issue in this case. See 11 U.S.C. § 554 (1995). As such, Attorney Decato appeared on behalf of Barrows at oral argument.

On appeal, Barrows argues that the trial court erred in: (1) failing to join the bankruptcy trustee in the State court proceedings; (2) finding that the defendants did not breach the May 24 agreement; (3) concluding that the defendants did not violate the Consumer Protection Act; (4) refusing to grant Barrows' motion for default against certain defendants; (5) finding that the defendants did not tortiously interfere with Barrows' contractual rights; (6) refusing to admit an affidavit of a witness who was deceased at trial; (7) ruling that the injunction bond could be held to satisfy damages arising from the TRO; (8) inadequately considering certain affidavits favorable to his case; and (9) denying his motion for reconsideration. He also claims that the Superior Court (*Morrill*, J.) erred when it denied Barco's motion for *ex parte* attachment of certain property of the defendants.

## II. Failure to Join Bankruptcy Trustee in State Court Proceedings

Barrows first argues that the trial court erred in allowing his claims and the defendants' counterclaims to go to judgment without the bankruptcy trustee being joined as a party to the proceedings. Because the bankruptcy trustee has abandoned interest in the claims against the defendants, Barrows' position is without merit. Interest in the lawsuit filed by Barrows belonged to the bankruptcy estate at the time of the trial. See 11 U.S.C. § 541(a) (1988); *Barletta v. Tedeschi*, 121 B.R. 669, 671 (Bankr. N.D.N.Y. 1990). When the trustee abandoned the claims, however, all interest in the lawsuit reverted back to Barrows as if no bankruptcy had been filed. See 11 U.S.C. § 554; *Barletta*, 121 B.R. at 673. In *Barletta v. Tedeschi*, the debtor filed suit on a claim that belonged to the bankruptcy estate. *Barletta*, 121 B.R. at 671, 674. The trustee subsequently abandoned its rights to the claim, and the defendant moved for summary judgment, arguing that the suit should be

dismissed because the debtor did not have standing to file suit at the time the action was commenced. *Id.* The court stated:

> The ordinary rule is that, when a trustee abandons property of the bankrupt, title reverts to the bankrupt, nunc pro tunc, so that he is treated as having owned it continuously. . . . [In other words,] [w]hen the trustee in bankruptcy abandons an asset, he is to be treated as having never had title to it; the abandonment *is said to relate back,* so that the title stands as if no assignment had been made.

*Id.* at 673 (quotations and citations omitted). Because the trustee in the instant case abandoned his rights to the lawsuit, Barrows is considered to have possessed rights to the suit at the time of trial and, therefore, has no grounds for challenging the lack of the trustee's involvement.

### III. Breach of May 24 Agreement

Next Barrows argues that the trial court erred in finding that the defendants did not breach the May 24 agreement. "Whether [conduct] is a material breach is a question for the trier of fact to determine from the facts and circumstances of the case." *Fitz v. Coutinho,* 136 N.H. 721, 725, 622 A.2d 1220, 1223 (1993). On appeal, we will not reverse the findings of the trial court unless they lack support in the record. *See id.* at 724, 622 A.2d at 1222–23.

Barrows contends that the trial court's conclusion is unsupported by the evidence. We disagree. The May 24 agreement provided for a mortgage loan of $250,000 "or up to a maximum of FIVE HUNDRED THOUSAND AND 0%100THS ($500,000.00) Dollars, the balance of TWO HUNDRED FIFTY THOUSAND AND 0%100THS ($250,000.00) Dollars to be advanced only upon the sole discretion of the said DIAMOND . . . ." The sums advanced were to be secured by a mortgage on Barrows' property. The promissory note produced at the June 1 closing provided that Barrows promised to pay the principal sum of $500,000. The note also provided that the lenders would be obligated to advance up to $250,000 within thirty days, and that sums in excess of $250,000 would be advanced at the sole discretion of the lenders. The trial court found that Barrows' "sole objection to the note at closing . . . related to the clause which stated Barrows's promise to pay $500,000," and that Barrows' refusal to sign the note when the lenders were willing to reduce the sum from $500,000 to $250,000 was a breach of good faith and fair dealing. This conclusion is amply supported by the record.

 Ruth Potter, Barrows' attorney in the loan negotiations, testified that Diamond agreed to reduce the principal sum from

$500,000 to $250,000 after Barrows protested. Laschever also testified that during the negotiations on the note it was agreed that the sum would be reduced from $500,000 to $250,000. He acknowledged that he sent Barrows' attorney another promissory note with the principal sum of $500,000 after the June 1 closing. He also testified, however, that the lenders were willing to change the note to reflect the fact that $250,000 would be disbursed, that the lenders would disburse an additional $250,000 at their option, and that Barrows would only be obligated on the amount actually disbursed. This change would have made the note consistent with the September 20 note, which contained the notation that Barrows was only obligated on the amounts actually disbursed. Laschever testified that when they offered to make these changes Barrows became abusive and uncooperative. This evidence supports the trial court's conclusion that Barrows breached the implied covenant of good faith and fair dealing by refusing to sign the June 1 note after the defendants offered to alter its terms.

Barrows also argues that the trial court erred by not considering other inconsistencies between the May 24 agreement and the June 1 note. The trial court concluded that having failed to notify the defendants of his objection to the other terms of the note at closing, Barrows could not later rely upon these objections at trial. Testimony of Laschever and Potter, as well as a letter from Potter to Laschever, indicate Barrows' only objection was to the $500,000 principal sum recited in the note. "[I]n this State every agreement contains an implied covenant that each of the parties will deal in good faith and deal fairly with the other." *Bursey v. Clement*, 118 N.H. 412, 414, 387 A.2d 346, 347 (1978) (quotation omitted). "Fair dealing" may include giving the opposing party fair notice and an opportunity to cure any significant objections before being held liable. *Cf.* RSA 382-A:2-605 (1)(a) (1994) (buyer's failure to notify seller of defect precludes reliance on such defect to establish breach where seller could have cured if notified seasonably). Under the circumstances of this case, the trial court did not err in concluding that because Barrows failed to object, he could not rely upon these inconsistencies as a basis at trial to allege a breach of the May 24 agreement.

## IV. Consumer Protection Act

Barrows next challenges the trial court's conclusion that the defendants did not engage in a pattern of unfair or deceptive practices in violation of the Consumer Protection Act. The trial court's "findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute a clear error of law." *Unit*

*Owners Assoc. of Summit Vista Lot 8 Condo. v. Miller*, 141 N.H. 39, 43, 677 A.2d 138, 141 (1996).

Barrows contends that the defendants acted in an unfair or deceptive manner at several points in their extensive negotiations by making promises and then failing to comply with the conditions that the parties previously agreed upon, and by altering the terms of the parties' previous agreements without giving Barrows the opportunity to object. RSA 358-A:2 (1989) (amended 1994) provides: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." Although RSA 358-A:2 is broadly worded, not all conduct in the course of trade or commerce falls within its protection. *See Roberts v. General Motors Corp.*, 138 N.H. 532, 538, 643 A.2d 956, 960 (1994). After observing that it is impossible to establish a fixed definition of unfair or deceptive acts, the Massachusetts Court of Appeals enunciated a now-commonly accepted test for determining whether conduct is unfair or deceptive. The court stated: "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979); *see Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991) (applying "rascality" test).

Barrows argues that the defendants' actions were clearly unfair and deceptive. The trial court found that although the Diamond Group at times did alter the terms of prior agreements, "all of these offers were explicitly tentative and subject to further conditions which were not fulfilled," and that Barrows was free to reject the defendants' tendered performance, negotiate further, or demand performance in accordance with the parties' prior agreements.

■ An ordinary breach of contract claim does not present an occasion for the remedies under the Consumer Protection Act. *See Atkinson v. Rosenthal*, 598 N.E.2d 666, 670 (Mass. App. Ct. 1992). Although the trial court found that the defendants had "sweetened" the terms of the loan, "selfish bargaining and business dealings will not be enough to justify a claim for damages" under the Consumer Protection Act. *Eastern Motor Inns, Inc. v. Ricci*, 565 A.2d 1265, 1274 (R.I. 1989). The defendants' conduct simply falls within the rough edges of commercial lending. While Barrows claimed that the defendants' alleged "bait and switch" tactics were deceptive and left him no choice but to sign the agreements, the defendants characterized their acts as accommodating, especially in light of Barrows' own allegedly deceptive behavior. "When there is conflicting testi-

mony, we defer to the findings of the trier of fact unless no reasonable person could have come to the same conclusion." *Cook v. CIGNA Ins. Co.*, 139 N.H. 486, 489, 657 A.2d 834, 836 (1995) (brackets omitted). The record supports the findings of the trial court that the initial terms outlined by Laschever were tentative. In fact, there was testimony that indicated that the initial terms were proposed by Barrows, not the Diamond Group. Regardless, Barrows did not refuse to accept the defendants' terms at closing or insist that they abide by terms of earlier agreements.

Therefore, Barrows has failed to prove that the defendants acted in a way that would "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings*, 396 N.E.2d at 153.

## V. Default Judgment

Barrows next argues that the trial court erred by refusing to grant his motion for default judgment against the defendants who were not present during the trial on the merits. Although every defendant filed an appearance *pro se*, only four defendants were physically present during the proceedings. During the trial, a question arose as to when the defendants who were not present at trial had provided Laschever with powers of attorney authorizing him to provide Barco with a subordination agreement. Barrows attempted to call each of the absent defendants to the stand and then moved for a default judgment when they did not appear. The court denied the motion for default judgment.

A party who has entered an appearance may be subject to default. *See* 5 R. WIEBUSCH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 1094, at 64–65 (1984). It is well-settled that on appeal, we will not disturb a trial court's denial of a motion to strike a default absent an abuse of discretion or error of law. *Barton v. Hayes*, 141 N.H. 118, 120, 677 A.2d 694, 695 (1996). We hold that the court's discretion to deny a motion to default is at least as great, and accordingly on appeal will apply the same standard of review. *See Schoonover v. American Family Ins. Group*, 595 N.E.2d 230, 234 (Ill. App. Ct. 1992).

The trial court properly exercised its discretion in refusing to grant a default judgment against the absent defendants. Each of these defendants filed a *pro se* appearance, indicating a desire to proceed with the action. At several points during the trial proceedings Barrows was asked to inform the court as to the identity of the witnesses he intended to call, and Barrows never indicated he intended to call the absent defendants. The court held that the

motion for default judgment was "a tactical ploy in the nature of 'trial by ambush'" because Barrows, knowing that these defendants would not be present at trial, waited until the close of his case to call them. The trial court concluded that because the absent defendants had no first-hand knowledge of negotiations with Barrows and that their interests were identical to those of the defendants present at trial, the absent defendants' presence at trial was unnecessary. The trial court therefore did not err in concluding that the interests of justice required that the motion for default be denied.

*VI. Intentional Interference with Contractual Relationship*

Barrows next argues that the trial court erred in finding that the defendants did not tortiously interfere with Barrows' contractual rights. Barrows' claim is based on a letter sent by Diamond to the tenants of the mobile home park formerly owned by Barrows. In July 1989, First Northern Bank began foreclosure proceedings against mobile home parks on which it held a first mortgage and the Diamond Group held a second mortgage. At the foreclosure sale on July 14, Diamond successfully bid on the mobile home parks. On July 19, Jerome Diamond, as trustee, sent a letter addressed to "All Tenants of Village Hill [and] Village Park Mobile Home Parks," which read:

> Please take notice that the park in which you now reside is no longer owned by Mr. Barrows!!! Beginning on August 1, 1989 and each month thereafter, you are to make payments of your rent to JEROME H. DIAMOND and mail it to the above address. *Do not pay MR. BARROWS!!!!* *If you do pay Mr. Barrows, then you will still be liable for the rent!!!*
>
> *To those of you who have not paid the taxes due on your homes, it is urgent that you bring the taxes up to date immediately, or you will be subject attachment and loss of your homes!!!*

The sale of the parks to the defendants was not complete until August 8th. Barrows argues that by instructing the tenants to pay rents to Diamond before the defendants were the rightful owners of the mobile home parks, the defendants engaged in tortious interference with the contractual rights that Barrows had with his tenants.

In order to succeed on a claim of tortious interference with a contractual relationship, a plaintiff must show that the plaintiff had a contractual relationship with a third party; that the defendants

knew of the contractual relationship between the plaintiff and the third party; and that the defendants wrongfully induced the third party to breach his agreement with the plaintiff. *See Montrone v. Maxfield*, 122 N.H. 724, 726, 449 A.2d 1216, 1217 (1982). In this case, the defendants did not interfere with any rights of Barrows to rent in the foreclosed properties.

■ The mortgagor does not have a right of redemption after foreclosure. RSA 479:18, :19 (1992). Even though legal title does not pass until the deed has been recorded, *see* RSA 479:26, II (1992), "this rule does not change the fact that [the debtor] possessed neither a legal nor an equitable interest in the property once the auctioneer's hammer fell and the memorandum of sale was signed." *Abdelhaq v. Pflug*, 82 B.R. 807, 810 (Bankr. E.D. Va. 1988); *see In re Hazelton*, 137 B.R. 560, 562 (Bankr. D.N.H. 1992). Furthermore, where a senior mortgagee has enforced its rights in foreclosure, it must offset rents received against the unsatisfied debt obligation and cannot allow the debtor to collect the rents to the prejudice of the junior creditors. *Cf.* 55 AM. JUR. 2D *Mortgages* § 225 (1971). At the time of the foreclosure sale, Barrows owed the Diamond Group a principal balance of $750,000. After satisfying First Northern's first mortgage from the proceeds of the foreclosure sale, and crediting the remainder against Barrows' outstanding debt under the September 20th note and second mortgage, Barrows still owed an outstanding balance of $649,506. Therefore, because any rents collected should have been first offset against the senior debt, and since Barrows, after foreclosure, could not have collected the rents to the detriment of the Diamond Group (as a second mortgagee), the defendants did not interfere with any rights of Barrows.

## VII. Admission of Affidavit

Barrows' next ground for appeal is based on the trial court's refusal to admit an affidavit of a witness who was deceased at the time of trial. "A decision on the admissibility of hearsay evidence is within the sound discretion of the trial court and will not be disturbed unless clearly erroneous." *Chinburg v. Chinburg*, 139 N.H. 616, 618, 660 A.2d 1127, 1129 (1995).

William Polaski, a civil engineer who was the project engineer on Barrows' condominium project, had several conversations with Diamond. On December 27, 1989, Polaski apparently signed an affidavit in which he stated that during his conversations with Diamond, Diamond expressed the desire to financially ruin Barrows.

■ Barrows argues that the statements in the affidavit that are attributable to Diamond are statements of a party-opponent and

therefore not hearsay. While it is true that these statements are not hearsay, see N.H. R. EV. 801(d)(2), the affidavit itself is hearsay because Polaski is not a party-opponent. Barrows argues that because Polaski was dead he was unavailable as a witness, N.H. R. EV. 804(a)(4), and therefore, his affidavit was admissible. Unavailability alone, however, is not enough to make a hearsay statement admissible. The statement must fall within one of the exceptions listed in Rule 804(b). Barrows seems to argue that because the affidavit was admitted during earlier proceedings in the case when Polaski was alive, and the defendants did not then call Polaski to the stand for cross-examination, the affidavit should be admitted as former testimony. N.H. R. EV. 804(b)(1). The hearsay exception for prior testimony is specifically limited to *testimony* of an unavailable witness at another hearing or in a deposition at which the party against whom the testimony is now offered had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." *Id.* An affidavit is not admissible because it does not provide the opposing party with the opportunity to cross-examine the affiant. *See* 5 J. WIGMORE, EVIDENCE § 1384, at 84–85 (Chadbourn rev. 1974); *cf. Manchenton v. Auto Leasing Corp.*, 135 N.H. 298, 301–02, 605 A.2d 208, 211 (1992). Simply introducing the affidavit at a prior hearing does not satisfy the requirement that the party against whom the evidence is offered has the opportunity to examine the affiant. *See Fender v. Ramsey & Phillips*, 62 S.E. 527, 528 (Ga. 1908). Therefore, we conclude that the trial court committed no error in excluding the affidavit.

*VIII. Release of the Injunction Bond*

Next Barrows argues that the trial court erred in ruling that the injunction bond could be held to satisfy damages that the defendants incurred as a result of the temporary restraining order that was in effect from November 14, 1989, until January 6, 1990.

As part of its motion to intervene and for reconsideration, the bankruptcy trustee requested the superior court to release the injunction bond to the bankruptcy estate as a voidable preference. The trustee's motion on this issue was denied. The superior court ruled, however, that the bond would nonetheless be released to the bankruptcy court if it so ordered. The bankruptcy court then ruled that it would defer to the superior court on the issue of whether the bond was a voidable preference. After the filing of the notice of appeal on May 8, 1992, Barrows petitioned the superior court seeking a determination that the bond should be released to the bankruptcy estate.

Because the defendants did not appear at a hearing to determine the status of the bond, the superior court initially ruled on September 8, 1992, that the bond should be released to the bankruptcy trustee. Both Laschever and the Diamond Group moved for reconsideration in September 1992. The plaintiff's brief, filed by the trustee in October 1992, nonetheless continued to argue that it was error not to release the bond funds to the trustee. Subsequently, the trustee abandoned all interest in the bond. As a result, the superior court concluded on December 14, 1992, that its order releasing the bond to the bankruptcy estate was moot. Further, the court ruled that the bond would cover damages from "mid-November 1989" until January 19, 1990, the date on which the automatic stay went into effect, and that the balance of the proceeds would be remitted to Barrows. The court also held that the bond covered only damages resulting from the TRO and not from the defendants' verdict on their counterclaim.

Rather than amending the appeal before this court, Barrows filed a motion for reconsideration in superior court. While that motion was pending, the defendants filed their brief with this court in January 1993. The trial court held a hearing on February 16, 1993, and granted Barrows' motion for reconsideration, ordering the bond to be released to Barrows. Accordingly, the issue raised on appeal of whether the trial court erred when it refused to release the bond to the trustee is now moot and will not be considered by this court.

At oral argument in March 1993, Diamond contended that a hearing had been held on the issue of damages resulting from the TRO. Subsequent to oral argument, and pursuant to an agreement of the parties, the bond was released to Laschever as escrow agent. The agreement instructed Laschever to hold the funds until settlement had been reached with each of the defendants, or "[i]n the event no settlement is reached, then Attorney Laschever agrees to adhere to the orders of the New Hampshire Supreme Court in any final disbursement of bond monies." It is not the role of this court to determine issues not properly before it. Cf. Quinlan v. City of Dover, 136 N.H. 226, 232, 614 A.2d 1057, 1060–61 (1992). Further, any determination of a fair disbursement of the monies would require this court to act as a factfinder. See Bogardus v. Zinkevicz, 134 N.H. 527, 532, 596 A.2d 722, 725 (1991). Therefore, the parties must initiate proper proceedings in the appropriate court to determine disbursement of the funds.

## IX. Ex Parte Attachment

Barrows, on behalf of Barco, asserts that the court erred when it denied Barco's motion for ex parte attachment of certain property of

the defendants. The motion for *ex parte* attachment is based on Barco's claim that the defendants improperly discharged the $230,000 mortgage in Barco's favor without first giving Barco a new $130,000 mortgage pursuant to the March 1989 agreement.

The trial court specifically found that Barco had no claim against the defendants because Barrows, as sole owner of Barco, caused a material breach of the March 1989 agreement. Because of this breach, the court ruled that the defendants were no longer obligated to comply with the terms of the March 1989 agreement. Accordingly, the trial court denied the plaintiff's request for a finding that the defendants committed breach when Laschever recorded the discharge.

The only issue on appeal involves the court's order denying the motion for *ex parte* attachment, not whether the court erred with respect to its findings on the merits of the underlying claim. The plaintiff's only argument in its brief regarding the underlying claim is that "the record is clear that the Diamond Group had no right at all to record the Barco mortgage discharge." We do not view the plaintiff's passing reference to this issue in its brief as properly raising that issue on appeal, and we therefore deem it waived. *D.W. Clark Road Equip., Inc. v. Murray Walter, Inc.*, 124 N.H. 281, 285, 469 A.2d 1326, 1329 (1983). Therefore, we must uphold the findings of the trial court with respect to the alleged breach of the March 24th agreement, vis-a-vis Barco. Accordingly, any issues regarding the denial of an *ex parte* attachment are moot.

## X. Affidavits Presented at Trial

Barrows next argues that the trial court erred by not adequately considering affidavits from Attorney Ruth Potter, Michael Nesbitt, and Robert McManus. Each of the affidavits contained statements that supported Barrows' claims. Barrows contends that the trial court's failure to explicitly address the evidence presented by these affidavits is reversible error.

> The resolution of conflicts in the evidence and determination of issues of fact are functions of the trier of fact. Because the proper standard of review with respect to the weight of evidence is not whether this court would have found differently but whether a reasonable person could find as did [the trial court], we will not disturb the decision of the finder of fact unless it is clearly erroneous.

*Belknap Textiles, Inc. v. Belknap Industries, Inc.*, 121 N.H. 28, 30, 424 A.2d 1141, 1142 (1981) (citations omitted). The trial court, acting as the finder of fact, is not required to explain away all inconsisten-

cies in the evidence presented at trial. Our review of the record reflects that the trial court's factual determinations are adequately supported by the testimony and other evidence presented at trial. *See Guaraldi v. Trans-Lease Group*, 136 N.H. 457, 461, 617 A.2d 648, 650 (1992).

*XI. Motion for Reconsideration*

Finally, Barrows argues that the trial court erred in not granting his motion for reconsideration. After trial, both the bankruptcy trustee and Barrows filed motions requesting the trial court to reconsider its order of January 27, 1992, relating to the trial on the merits of the plaintiffs' claims and the defendants' counterclaim. The trial court denied these motions.

A motion for reconsideration allows a party to present "points of law or fact that the Court has overlooked or misapprehended." SUPER. CT. R. 59-A(1). "We will uphold a trial court's decision on a motion for reconsideration absent an abuse of discretion." *Fortin v. Manchester Housing Auth.*, 133 N.H. 154, 160, 574 A.2d 945, 950 (1990). With the exception of the allegation that the bankruptcy trustee should have been joined in the suit — an issue that is now moot — the motions for reconsideration simply reiterated the arguments made at trial. The record adequately supports the trial court's order. Accordingly, the trial court did not abuse its discretion in denying Barrows' motion for reconsideration.

*Affirmed.*

BRODERICK, J., did not sit; the others concurred.