Technology v. Moore                    CV-02-146-M    07/19/02
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Technology Planning Int'l., LLC,
RBP Holdings, Ltd., and
Dover Technologies, Ltd.,
     Plaintiffs

     v.                                    Civil No. 02-146-SM
                                           Opinion No. 2002 DNH 138
Moore North America, Inc.
and Raymond Hartman,
     Defendants


                            O R D E R


     On January 30, 2002, representatives of Moore North America,

Inc. ("Moore") and Technology Planning International, LLC ("TPI")

executed a letter of understanding (the "Letter Agreement") which

"set forth certain non-binding understandings and certain binding

agreements between [TPI] and [Moore] with respect to [TPI's]

possible acquisition of [Moore's] Document Automation Systems

contract manufacturing business located in Dover, New Hampshire."

Letter Agreement, Exhibit 1 to plaintiffs' complaint, at 1.  It

was signed by Sean Sullivan, in his capacity as Senior Vice

President of Moore, and Richard Piller, in his capacity as

President of TPI.

According to TPI, after conducting some due diligence, it discovered that the Document Automation Systems business (the "Company") was not as profitable as it had been led to believe, sales in the pipeline were off historical levels, and the sales staff was not accepting new orders from customers. Subsequently, negotiations between the parties deteriorated and they have yet to execute a purchase and sale agreement (though neither party has given the other written notice of its intent to terminate the Letter Agreement and, according to TPI, Moore has yet to return its $10,000 deposit).

TPI, along with RBP Holdings, Ltd., and Dover Technologies, Ltd., describe this suit as one seeking "specific performance of their contract rights pursuant to a letter agreement dated January 30th, 2002, as extended, or, in the alternative, . . . damages from Defendants under various theories of tort and contract law." Complaint, at para. 6. They seek "either equitable relief, in the form of specific performance, or monetary damages," id., and have sued both Moore and Raymond Hartman, Moore's Senior Vice President in charge of the Company. Moore moves to dismiss all claims against it, saying TPI's

complaint fails to set forth viable causes of action.  TPI
objects.

## Standard of Review

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), the court must "accept as true the well-pleaded factual
allegations of the complaint, draw all reasonable inferences
therefrom in the plaintiff's favor and determine whether the
complaint, so read, sets forth facts sufficient to justify
recovery on any cognizable theory."  Martin v. Applied Cellular
Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002).  Dismissal is
appropriate only if "it clearly appears, according to the facts
alleged, that the plaintiff cannot recover on any viable theory."
Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir.
2000).  See also Gorski v. N.H. Dept. of Corrections, 290 F.3d
466, 472 (1st Cir. 2002) ("The issue presently before us,
however, is not what the plaintiff is required ultimately to
prove in order to prevail on her claim, but rather what she is
required to plead in order to be permitted to develop her case
for eventual adjudication on the merits.") (emphasis in
original).

3

**Background**

Crediting the allegations set forth in the complaint as true, and viewing them in the light most favorable to TPI, the pertinent facts appear as follows.

In November of 2001, defendant Hartman approached TPI's president, Richard Piller, to see if TPI would be interested in purchasing the Company. After reviewing some financial documents and meeting with various representatives of the Company, TPI expressed an interest in acquiring it. By letter dated January 14, 2002, Piller, in his capacity as president of TPI, contacted Moore with the following proposal: "At this point in time we are willing to make an offer to purchase the entire Dover operations as represented by you for a fair market price of US $3.5 million. Please consider this to be in effect our letter of intent. We are prepared to forward a check in the amount of $10,000 to bind the deal." Exhibit 7 to plaintiffs' complaint. Approximately two weeks later, on January 30, 2002, representatives of Moore and TPI executed the Letter Agreement.

4

The Letter Agreement is divided into two sections. The first, captioned "Nonbinding Provisions," addresses the following five areas: (1) the "Basic Transaction," by which TPI "would acquire or accept assignment of . . . substantially all of the assets of the Company." Id., at 1; (2) the proposed purchase price of $3.5 Million, less TPI's deposit of $10,000; (3) TPI's due diligence; (4) the intention of the parties to promptly begin negotiating the terms of a written purchase and sale agreement; and (5) the customary terms and conditions to which the purchase and sale agreement, if executed, would be subject. The Letter Agreement specifically provides that the parties understand and intend that the non-binding provisions:

> are not intended to create or constitute any legally binding obligation between the Prospective Buyer and the Prospective Seller, and neither Prospective Buyer nor the Prospective Seller shall have any liability to the other party with respect to the Non-binding Provisions until a fully integrated, definitive purchase and sale agreement, and other related documents are prepared, authorized, executed and delivered by and between all parties.

Id. at 1. See also id. at 3.

The second section of the Letter Agreement is captioned "Binding Provisions," and provides, among other things, the following: (1) the non-binding provisions of the Letter Agreement are not enforceable by or against either of the parties; (2) Moore shall provide TPI with complete access to the Company's facilities, books, and records and shall cooperate fully with TPI's due diligence investigation of the Company; (3) each party shall be responsible for, and shall bear, its own costs and expenses incurred in connection with the proposed purchase and sale of the Company; (4) the means by which the binding provisions set forth in the Letter Agreement may be terminated; and (5) a standstill period, during which Moore agreed not to enter into any discussions with third parties concerning the sale of the Company.

According to TPI, it expended nearly $300,000 in conducting its due diligence investigation of the Company and says it was led to believe that it was purchasing a "going concern." The proposed purchase price referenced in the Letter Agreement is $3.5 Million. In addition to the Letter Agreement, TPI says the parties also negotiated an oral "collateral agreement," pursuant

6

to which TPI would pay an additional $1.7 Million "to absorb off balance sheet liability . . . for an Employee Severance package, . . . thus yielding a purchase price of $5.2 Million for the going concern together with the underlying real estate." Complaint at para. 17.

In early January, 2002 (apparently before the parties executed the Letter Agreement), TPI says it received financial statements that showed the Company had historically generated approximately $2 Million in sales each month, with a "positive cash flow" of approximately $2 Million each year. Complaint at para. 41. It does not dispute the accuracy of those statements. During the course of its due diligence, however, TPI says it discovered that Company executives had instructed the sales staff "not to push for new sales." Id. at para. 44. It says it also learned that "business booked for March, April, May and June . . . was falling short of forecast." Id. at para. 49.

Notwithstanding the fact that its due diligence revealed issues that caused it substantial concern, TPI says it "continued to diligently pursue the acquisition of the [Company] as a going

concern, making sales calls and during the week of March 18th booking in excess of $1 Million in new business [on behalf of the Company]." Id. at para. 52. In March of 2002, however, TPI says it "became clear that [Moore] ha[d] no present intention to complete the sale of the business as a going concern as originally agreed." Id. at para. 54.[1] This suit followed.

----

[1] While TPI's complaint repeatedly alleges that Moore sought to impede its ability to purchase the Company as a "going concern," it is not entirely clear what TPI means when it uses that phrase. The phrase suggests that TPI would purchase the land and buildings on which the Company operated, as well as the machines it used in production, computers, office equipment, software licenses, pending sales, accounts receivable, etc. Nothing in the Complaint, however, suggests that Moore ever proposed to sell anything less than a "going concern." To the extent TPI uses that phrase to mean an operating business, actively employing people, making products, and taking new sales orders, Moore has represented (and TPI does not seem to dispute) that, at least as of March, 2002 (when TPI filed this suit), the Company remained in business and continued to accept new orders. See Defendant's motion to dismiss (document no. 6) at 11 ("On the face of the pleadings, it is obvious that [the Company] was in fact a 'going concern' and accepted new orders for business. Plaintiffs do not allege that the facility has closed, and to this day it continues in active operation. Indeed, Plaintiffs allege that as of March 18, they had 'continued to pursue the acquisition of the [Company] as a going concern' and made sales calls 'booking in excess of $1 million in new business.'") (quoting plaintiff's complaint at para. 52).

**Discussion**

I.   Count I - Specific Performance.

In count 1 of its complaint, TPI seeks "specific performance" of the Letter Agreement, the "collateral agreement" governing its proposed purchase of the $1.7 Million off balance sheet liability for an Employee Severance package, and other "oral agreements and representations." See Plaintiffs' objection at 10. TPI claims it can successfully prove the existence of those other oral agreements through the introduction of parole evidence. Consequently, it says it is entitled to a judgment ordering "the corporate defendant to make good on its initial promise to deliver at closing a going concern with monthly sales volume of $2 Million and positive annual cash flow of $2 Million," complaint at para. 55, notwithstanding the fact that it acknowledges that the Company will not (and apparently can not) continue to perform at those historical levels.

There are several problems with TPI's claim for specific performance. Independent of issues involving the introduction of parole evidence, and looking beyond the hurdles imposed by the statute of frauds, TPI's complaint fails to identify an

9

enforceable contractual agreement that might lend itself to a judicial order compelling Moore to sell the Company on the terms sought by TPI. First, contrary to TPI's suggestion, neither the Letter Agreement nor the so-called "collateral agreement" concerning the employee severance package obligates Moore "to deliver at closing a going concern with monthly sales volume of $2 Million and positive annual cash flow of $2 Million." Complaint at para. 55. As TPI appears to concede, those numbers represent an accurate picture of the Company's past performance. Nothing referenced in the complaint, however, suggests that Moore guaranteed that the Company would continue to perform at (or above) that level.

More importantly, perhaps, the non-binding provisions of the Letter Agreement clearly and unequivocally state that they are intended merely to evidence the parties' future intention to negotiate the terms of, and ultimately enter into, a binding purchase and sale agreement. So, for example, the first sentence of the Letter Agreement makes reference to TPI's "possible acquisition" of the Company. Neither the Letter Agreement nor the so-called "collateral agreement," as described by TPI,

10

suggests that it represents a final meeting of the minds between the parties as to the terms and conditions under which Moore would convey to TPI the Company, its assets, and liabilities.

TPI is mistaken in asserting that the Letter Agreement, either standing alone or when read in conjunction with the alleged collateral agreement(s), constitutes a binding and enforceable contract for the sale of the Company. TPI's confusion on this issue is perhaps best illustrated in its objection to Moore's motion to dismiss, in which it says:

> At its most elementary level, in order to be enforceable an agreement requires consideration. TPI tendered consideration to [Moore], [Moore] accepted that consideration and has yet to return the consideration to TPI. As such, on the most fundamental level, a contract exists between the parties for the sale of the [Company] by [Moore] to TPI since consideration was tendered by the buyer, accepted by the seller and is, as of this writing, retained by the seller.

Plaintiffs' objection at 2-3 (emphasis supplied). See also Complaint at para. 38 ("Plaintiff TPI and Defendant MNA entered into a Letter Agreement by which TPI agreed to purchase defendant MNA's Document Automation Systems . . . for $3.5 million.).” (emphasis supplied). TPI's interpretation of the legal

11

significance of the facts alleged in the complaint is, however, incorrect; while aspects of the Letter Agreement may constitute an enforceable contract, it is not a binding purchase and sale agreement. To the contrary, the Letter Agreement unambiguously expresses the parties' understanding that it is merely a statement of their intention to conduct further negotiations and allow TPI the opportunity to pursue its due diligence investigation, with a view toward entering into a (written) binding purchase and sale agreement at some point in the future. Even if certain aspects of the Letter Agreement (i.e., the "Binding Provisions") lent themselves to the remedy of specific performance, that remedy would not include that which TPI seeks - an order compelling Moore to sell the Company subject to the terms described by TPI.

Finally, TPI's complaint fails to allege that Sean Sullivan was duly authorized by Moore to enter into a binding purchase and sale agreement relating to the Company, its assets, and liabilities. Typically, in the corporate setting, one would expect to see a resolution from the board of directors authorizing (or, at a minimum, ratifying) such conduct on behalf

of one of its employees.  Here, there is no allegation of such action by the board or any other entity that might be required to give its approval to Sullivan's efforts to obligate Moore to sell the Company.  Consequently, even if the terms of the Letter Agreement were sufficiently specific to lend themselves to the equitable remedy of specific performance (which they are not), nothing in the complaint suggests that the Letter Agreement is binding on Moore as a "purchase and sale agreement."  See, e.g., Shakra v. Benedictine Sisters of Bedford, 131 N.H. 417, 421-22 (1989) ("In this case, the court properly concluded that it was impossible to order specific performance because there was no valid contract in existence to be enforced . . . [since] Mr. Simonis did not have actual or apparent authority to contract for the sale of church property."); Ashuelot Paper Co. v. Ryll, 109 N.H. 573, 575 (1969) ("[N]either in the agreed facts nor in the offer of proof does it appear that the defendants authorized Paul Ryll 'by writing' to sign a memorandum on their behalf.  Our statute of frauds is not satisfied by a memorandum signed by an agent unless the agent was authorized to sign 'by writing.'").

13

II.  Count 4 - Negligent Misrepresentation.

In count 4 of its complaint, TPI alleges that Moore negligently represented the extent (and value) of the assets it proposed to sell to TPI.  Consequently, it seeks "$282,289, . . . exclusive of interest and costs, expended performing Plaintiffs' due diligence on the acquisition of the [Company]."  Complaint at para. 82.  In support of that claim, TPI alleges that:

> The documents provided to the Plaintiffs showed a going concern with monthly volume of approximately $2 million and positive annual cash flow of $2 million.
>
> Statements were made to Plaintiffs' representative that Plaintiffs were buying a going concern <u>and that the business was accepting orders</u> for equipment in the ordinary course.
>
> After repeated inquiries and in depth due diligence during which Plaintiffs uncovered Complaint Exhibit 3 [entitled, "DAS 2000 Strategy Document"], Plaintiffs discovered that the business was not being run as a going concern and that <u>orders were not being accepted</u> in the ordinary course.

Complaint at paras. 78-80 (citations omitted) (emphasis supplied).[2]

_____

[2]  Neither the complaint nor the attached affidavit of Richard Piller explains the significance, from TPI's perspective, of Exhibit 3 to the complaint, the "DAS 2000 Strategy Document." And, its relevance to TPI's case is not self-evident.

14

Under New Hampshire common law, "[t]he essential elements of negligent misrepresentation are a negligent misrepresentation by the defendant of a material fact and justifiable reliance by the plaintiff." Ingaharro v. Blanchette, 122 N.H. 54, 57 (1982) (citing Tober's Inc. v. Portsmouth Housing Auth., 116 N.H. 660, 663 (1976)). Importantly, however, "mere proof of breach of promise, whether or not the promise is a contractual term, will not support an action for misrepresentation. Otherwise every contract action would automatically acquire a tandem count in tort, and the tort claim would render nugatory any contractual limitation on liability." Hydraform Prods. Corp. v. American Steel & Alum. Corp., 127 N.H. 187, 200 (1985) (citations omitted).

TPI's negligent misrepresentation claim is based upon its assertion that substantial due diligence revealed that the Company was not as valuable as Moore had led it to believe. And, a fair reading of the complaint suggests that TPI claims it was misled into conducting expensive due diligence that it otherwise would not have undertaken. Although not expressly stated, TPI implicitly suggests that, had it not received such allegedly

15

false information from Moore at the outset, it never would have entertained thoughts of purchasing the Company and, therefore, never would have undertaken costly and time-consuming due diligence. So, notwithstanding its contractual obligation, as expressed in the Letter Agreement, to assume all expenses incurred in connection with the possible acquisition of the Company, TPI seeks damages in the amount of all sums expended during the course of its due diligence.

Parenthetically, the court notes that TPI acknowledges that at least some of those costs were incurred <u>after</u> it says it discovered the Company was less valuable than had been represented - a fact that would undermine any claim that TPI's continued reliance on the alleged misrepresentations was "reasonable" and "justified". It probably also bears noting that TPI does not claim that the Letter Agreement is void or otherwise unenforceable; it does not, for example, allege fraud in the inducement. To the contrary, it says the Letter Agreement is fully binding on both parties and actually seeks "specific performance" of that contract. Consequently, Moore suggests that the express (and binding) provisions of the Letter Agreement

preclude TPI from obtaining reimbursement for any sums expended during the course of TPI's due diligence.

As the relevant facts of this case are more fully developed, that or similar arguments may prove to be winning ones. See, e.g., Silver Hill Station Ltd. Pship. v. HSA/Wexford Bancgroup, LLC, 158 F. Supp. 2d 631, 642-43 (D. Md. 2001) (holding that express provisions in a loan agreement to the effect that no communications from lender to buyer constituted a commitment by lender to make the requested loan prevented borrower from prevailing on its negligent misrepresentation claim, in which it said that lender's agent assured it that loan would be approved). At this stage, however, given the substantial burden imposed upon Moore, see generally Gorski, supra, the court is constrained to conclude that TPI's negligent misrepresentation claim is barely sufficient to withstand Moore's motion to dismiss. If, as TPI's complaint suggests, prior to the parties' execution of the Letter Agreement, Moore represented that the Company was accepting, and would continue to accept, orders in the ordinary course, and if TPI justifiably relied on that representation in deciding to engage in due diligence, and if it subsequently turned out that

17

the Dover sales staff was specifically directed not to accept new orders and, in fact, "orders were not being accepted in the ordinary course," complaint at para. 80, TPI may have a viable claim for negligent misrepresentation.[3]

III. <u>Count 5 - Violations of the Consumer Protection Act</u>.

The New Hampshire Consumer Protection Act prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. ("RSA") 358-A:2. While the New Hampshire Supreme Court has observed that it is impossible to "establish a fixed definition of unfair or deceptive acts," <u>Barrows v. Boles</u>, 141 N.H. 382, 390 (1996) (citation omitted), it has concluded that, to be actionable under the statute, a defendant's conduct must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the

---

[3] Of course, it is entirely unclear why executives of the Company would instruct the Dover sales force to stop accepting incoming orders, as alleged in the complaint. Regardless of whether Moore intended to sell the Company or retain it, it is difficult to imagine why it would ever be motivated to sabotage or otherwise undermine the Company's future sales and, in the process, substantially diminish its value. As to that point, TPI's complaint is silent. But, perhaps with the benefit of some discovery, TPI will be better able to develop its theory.

world of commerce." Hobin v. Coldwell Banker Residential Affiliates, Inc., 144 N.H. 626, 635 (2000). An ordinary breach of contract claim, however, "does not present an occasion for the remedies under the Consumer Protection Act." Barrows, 141 N.H. at 390.

TPI's complaint alleges that Moore led it to believe that: provided the parties could agree of the terms and conditions of the sale, the Company would be sold to TPI as a "going concern," complaint at para. 55; reports provided to TPI in January showed that the Company had historically generated approximately $2 million each month in sales, with approximately $2 million in annual net income, id. at para. 41; in February, through its due diligence investigation, TPI learned that the Company's sales staff was not aggressively pursuing new sales, id. at para. 44; and "near the end of February," TPI learned that "business booked in March, April, May, and June . . . was falling short of forecasts," id. at 17. In fact, says TPI, defendant Hartman specifically instructed "sales personnel not to pursue sales," complaint at para. 69, thereby causing the substantial decrease in the Company's sales volume.

In support of its Consumer Protection Act claim, TPI says that:

> [T]he corporate defendant, [Moore], through numerous officers and agents, including Hartman, the individual defendant, utilized unfair or deceptive acts or practices in the conduct of trade or commerce within the state of New Hampshire by enticing Plaintiffs to purchase the [Company] for $3.5 million and assume responsibility for the $1.7 million Employee Severance package with knowledge that the entity that would be transacted at closing would be a mere shadow of the company advertised for sale[,] with a mere fraction of the sales volume and insufficient business to sustain the remaining work force of 80 +/- employees.

Complaint at para. 86. TPI's Consumer Protection Act claim is, however, undermined by the very allegations set forth in the complaint. TPI acknowledges that, consistent with the terms of the Letter Agreement, Moore provided it with full and open access to the Company, its employees, and its books. Based upon TPI's conversations with those employees and its review of the Company's books, it apparently concluded that the Company was no longer generating revenue sufficient to warrant the originally contemplated $3.5 million sale price.

TPI does not allege that Moore breached the terms of the Letter Agreement by denying it meaningful access to the Company,

20

its employees, or its books. Nor does it allege that Moore provided it with falsified statements of income, booked sales, or projected sales. At most, TPI's complaint might be read to suggest that Moore's initial representations concerning the Company's prospective value were overstated (a point TPI acknowledges it discovered through materials freely provided to it by Moore and the Company).

Even when viewed in the light most favorable to TPI, the complaint fails, as a matter of law, to state a viable claim under New Hampshire's Consumer Protection Act. At the very most, Moore's initial representations concerning the future value of the Company might be viewed as "puffing." Importantly, however, TPI acknowledges that it obtained an accurate view of the Company's future prospects and its current value through documents freely provided by Moore, prior to executing any binding purchase and sale agreement for the Company. Consequently, the conduct in which Moore allegedly engaged is, at the very worst, well "within the rough edges" of commercial negotiations. Barrows, 141 N.H. at 390. Based upon the allegations set forth in the complaint, Moore cannot be said to

21

have engaged in any conduct that was unfair or deceptive to the point that it "attain[ed] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id.

IV. The Status of RBP Holdings and Dover Technologies.

Because neither Dover Technologies nor RBP Holdings was a party to the Letter Agreement, it is unclear how they have standing to bring this action or, even if they have standing, that they have asserted viable claims against Moore. Accordingly, Moore moves to dismiss all claims advanced by those plaintiffs.

In response, TPI says, "Plaintiffs RBP Holdings, Ltd. and Dover Technologies, Ltd. were included as Plaintiffs in the matter before the court in recognition of Fed. R. Civ. P. 19(a), [as] persons to be joined if feasible." Plaintiffs' objection at 4. Although TPI acknowledges that "RBP and Dover Tech are not expected to have independent claims," it says "the evolution of the original transaction between [Moore] and TPI was such that the latter versions of the definitive agreement negotiated

22

between the parties were between [Moore] and RBP[,] with Dover Tech being the entity which would operate the [Company] once acquired." Id. (emphasis supplied). Plainly, more is necessary to demonstrate standing. Moreover, even viewing the complaint charitably, it simply fails to state any viable claim(s) on behalf of RBP or Dover Tech against Moore.

## Conclusion

For the foregoing reasons, TPI's complaint fails, as a matter of law, to state viable claims against Moore for specific performance or for relief under the New Hampshire Consumer Protection Act. Its negligent misrepresentation claim, however, is minimally sufficient to survive a motion to dismiss. Accordingly, defendant Moore's motion to dismiss (document no. 6) is granted in part and denied in part. It is granted insofar as it seeks dismissal of counts 1 and 5. In all other respects, however, it is denied.

Additionally, because neither RBP Holdings, Ltd. nor Dover Technologies, Ltd. has demonstrated that it is has viable claims against Moore (or, as TPI suggests, that it is a proper party

23

under Fed. R. Civ. P. 19(a)), all claims asserted by those entities against Moore are dismissed.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

July 19, 2002

cc:  William M. Richmond, Esq.
      Theresa D. O'Toole, Esq.
      Daniel P. Luker, Esq.
      Arpiar G. Saunders, Jr., Esq.