# United States Court of Appeals
## For the First Circuit

No. 04-1611

J.G.M.C.J. CORPORATION,

Plaintiff, Appellant,

v.

SEARS, ROEBUCK & COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. James R. Muirhead, U.S. Magistrate Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

William S. Gannon, on brief, for appellant.
Martha Van Oot and Orr & Reno, P.A., on brief, for appellee.

December 10, 2004

**STAHL**, <u>Senior Circuit Judge</u>.  Plaintiff-Appellant J.G.M.C.J. Corporation ("J.G.M.C.J.") purchased commercial property that was subject to a lease entered into by the original owner of the property and Defendant-Appellee Sears, Roebuck & Co. ("Sears"). Sears eventually assigned its interest in the lease to HomeLife Corporation ("HomeLife").  Before the lease term ended, HomeLife exercised two extension options contained in the lease.  HomeLife subsequently filed for bankruptcy protection, and J.G.M.C.J. now seeks declaratory judgment that Sears is obligated to pay rent pursuant to the extension of the lease.  J.G.M.C.J. also raises a variety of common law and statutory claims in an attempt to recover lost rent from Sears.  The district court granted summary judgment to Sears on all counts, and we affirm.

## I.  BACKGROUND

On February 1, 1990, Sears entered into a lease (the "Lease"), as tenant, with Cohas Brook Associates ("Cohas"), as landlord, for part of a to-be-constructed shopping plaza located at 1875 South Willow Street in Manchester, New Hampshire (the "Premises"). Apparently, J.G.M.C.J. then purchased the Premises from Cohas and constructed the plaza, largely in reliance on Sears' anchor tenancy and its creditworthiness as a tenant.  Upon completion of the construction, Sears used the leased space to open a "HOMELIFE" store, which at the time of the signing of the Lease was a division of Sears.

J.G.M.C.J. became the successor in interest to the Lease, which had been negotiated by Cohas.  The Lease had an original term of ten (10) years, with an option for Sears to extend the term for two (2) additional five (5) year terms upon 180 days notice to the landlord.  The Lease contained an Assignment and Sublease Clause, which read:

19.  Assignment and Sublease

[Sears] shall have the right to assign this lease . . . subject to [J.G.M.C.J.]'s approval . . . . In the event of . . . assignment, [Sears] shall remain responsible for the payment of rent and the performance of its other obligations, but not beyond the term to which [Sears] has agreed in writing.

Paragraph 3 of the Lease defined "term" as "commenc[ing] on the Commencement Date and terminat[ing] ten (10) years thereafter ("Term")."

Sears subsequently decided to sell off its HOMELIFE division to HomeLife Corp., retaining a nineteen percent ownership interest in the new corporation.  By letter dated November 24, 1998 (the "November 24, 1998 Letter"), Sears sought the consent of J.G.M.C.J., pursuant to Paragraph 19 of the Lease, to assign the Lease to HomeLife.  In this letter, Sears represented:

Please be assured that HomeLife will continue to operate the store as a HOMELIFE store.  The rights, duties and obligations of landlord and tenant under the Lease will not change.  Sears will continue to be responsible for the tenant's obligations under the Lease.

The assignment to HomeLife was approved in writing by J.G.M.C.J. on December 15, 1998. In conjunction with the assignment, J.G.M.C.J. provided HomeLife with an estoppel certificate dated December 15, 1998, which read in pertinent part:

> 1. The Lease is in full force and effect and has not been modified or amended except by [an amendment not relevant to this appeal]. There are no other agreements between Landlord and Tenant with respect to the Premises.
>
> 2. The term of the Lease commenced on August 1, 1990 and will continue until 11:59 p.m. July 31, 2000, subject to two five-year renewal options as provided for in the Lease.

Pursuant to J.G.M.C.J.'s consent, Sears, on February 1, 1999, assigned its "right, title and interest" in the Lease to HomeLife, which in turn assumed "all rights, obligations and duties" under the Lease.

In a letter dated October 5, 1999, J.G.M.C.J. advised Sears, pursuant to Paragraph 3A of the Lease, which obligated J.G.M.C.J. to provide Sears with "written notice of the imminent expiration of the Term," that the Lease would expire on July 31, 2000. The letter requested that Sears provide J.G.M.C.J. "notice of [its] intention to exercise [its] option to extend the term of the Lease for an additional five (5) years." Sears did not respond.

On July 24, 2000, J.G.M.C.J. and HomeLife executed an Extension and Amendment to the Lease ("Extension Agreement"), in which J.G.M.C.J. granted HomeLife's request to exercise both five-year extension options contained in the Lease. In addition, the

Extension Agreement materially altered several provisions of the Lease. For example, the Extension Agreement: (1) increased the rent for the extended terms to higher than what had been provided for in the original Lease and (2) amended a provision of the Lease, which originally stated that Sears did not have to operate a business on the Premises, to grant J.G.M.C.J. the right to terminate the Lease in the event HomeLife failed to operate a business on the premises for a period of ninety (90) consecutive days or longer.

Furthermore, the Extension Agreement provided that to the extent J.G.M.C.J. and HomeLife had the authority to so acknowledge, they acknowledged that "the execution of this Extension shall in no way be considered a waiver of Landlord's rights against Sears Roebuck and Co. under the Lease." Sears, however, was not a party to, and did not sign, the Extension Agreement.

On July 16, 2001, HomeLife filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. HomeLife continued to pay rent under the terms of the Extension Agreement until November 23, 2001, when the trustee rejected the Lease.

On August 5, 2003, J.G.M.C.J. filed its Amended and Restated Complaint against Sears, seeking declaratory judgment that Sears is obligated to perform under the terms of the Extension Agreement, and also alleging that Sears: (1) breached the implied covenant of good faith and fair dealing; (2) committed the tort of negligent

-5-

representation; (3) would be unjustly enriched if excused from performance under the Extension Agreement; and (4) engaged in unfair or deceptive acts in violation of the New Hampshire Consumer Protection Act.  On March 3, 2004, the district court[1] granted Sears' Motion for Summary Judgment on all counts.  J.G.M.C.J. filed this timely appeal.

## II. DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In ruling on the motion, the district court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).

We note at the outset that the Lease, pursuant to Paragraph 23, is governed by New Hampshire law.  Under New Hampshire law, "[a] lease is a form of contract that is construed in accordance

---

[1]Pursuant to District of New Hampshire Local Rule 73.1(b)(2), this case was randomly assigned to a United States Magistrate Judge, an assignment to which the parties did not object.  In accordance with 28 U.S.C. § 636(c) and New Hampshire Local Rule 73.1(a), the Magistrate Judge was designated to conduct any and all proceedings.  An appeal from a judgment entered by a Magistrate Judge pursuant to this procedure is treated in the same manner as an appeal from any other judgment of a district court.

with the standard rules of contract interpretation." Echo Consulting Servs., Inc. v. N. Conway Bank, 669 A.2d 227, 230 (N.H. 1995). "[T]he proper interpretation of a lease is ultimately a question of law for [the] court to determine." N.A.P.P. Realty Trust v. CC Enters., 784 A.2d 1166, 1168 (N.H. 2001) (citation omitted). Moreover, "[i]n the absence of ambiguity, the intent of the parties to a lease is to be determined from the plain meaning of the language used." Echo Consulting Servs., 669 A.2d at 230. And, the "determination whether a contract term is ambiguous" is a question of law. Id.

With these background contract principles in mind, we engage in plenary review of the district court's grant of summary judgment. Burns v. State Police Ass'n of Mass., 230 F.3d 8, 10 (1st Cir. 2000). J.G.M.C.J. raises the variety of claims listed above in an attempt to bind Sears to the Extension Agreement. We, like the district court below, find them all without merit.

A. Declaratory Judgment on Sears' Obligations Under the Extension Agreement

First, J.G.M.C.J. claims that Sears remained liable under the Extension Agreement by virtue of the common law contract principle that an original lessee, after assignment, remains liable for the payment of rent during the assignee's extension of the lease. See Maybury Shoe Co. v. Rochester Factory Holding Co., 185 A. 654, 655 (N.H. 1936) (noting that "[t]he lessees' personal covenant to pay the rent applied to the extended term [of the lease]"). Although

this is an accurate statement of the common law, just as parties to a contract may negotiate terms that vary from the common law, parties to a lease may limit their respective obligations in the event of an assignment.  Cf. S. S. Kresge Co. v. Sears, 87 F.2d 135, 138 (1st Cir. 1936) (stating that under Massachusetts common law, parties can contract, "in case of assignment . . .[,] that lessee shall not be further liable").  Here, Sears did just that: it limited its obligation in the event of assignment through Paragraph 19 of the Lease.  In that Paragraph, Sears and J.G.M.C.J. expressly agreed that, in the event of assignment of the Lease, Sears would not be responsible for the payment of rent and the performance of other obligations "beyond the term to which [Sears] ha[d] agreed in writing."  (Emphasis added.)

To get around this express limitation, J.G.M.C.J. argues that the "term" referenced in Paragraph 19 is the original ten-year term plus the two five-year extension options.  This argument fails because the Lease "term" is defined in Paragraph 3 of the Lease as that period of time "commenc[ing] on the Commencement Date and terminat[ing] ten (10) years thereafter."[2]

_____

[2]We note that J.G.M.C.J. itself called the original ten-year lease term the "term" in its letter of October 5, 1999, notifying Sears of the expiration of the Lease.  In that letter, J.G.M.C.J., through its President John B. Sullivan, stated, "please accept this notice of the 'imminent expiration of the term of the Sears' Lease.'"

Alternatively, J.G.M.C.J. argues that Paragraph 19 was amended by the parties pursuant to Paragraph 22, which provided that the Lease may be amended "by an instrument in writing signed by the parties."  Under this theory, J.G.M.C.J. proposes that Sears' November 24, 1998 Letter, read together with J.G.M.C.J.'s letter approving Sears' assignment of the Lease to HomeLife and an estoppel certificate provided to Sears by J.G.M.C.J., amended Paragraph 19 to make Sears liable in the event HomeLife exercised the extension options contained in the Lease, even without Sears' written consent.  Although it is true that a writing requirement can be satisfied by a series of documents, see Ashuelot Paper Co. v. Ryll, 259 A.2d 657, 658 (N.H. 1969), these documents, read as a whole, did not amend Paragraph 19.[3]

Furthermore, J.G.M.C.J.'s own actions at the time HomeLife exercised the extension options would have acted to terminate Sears' obligations under the Lease by operation of law because the Extension Agreement materially altered the terms of the original Lease.  Under common law principles, upon assignment of a lease, the original "lessee becomes a surety for the performance of the covenants of the lease by the assignee." Cf. S. S. Kresge, 87 F.2d at 138 (discussing the obligations of an assignor under

---

[3]Interestingly, on December 15, 1998, J.G.M.C.J. provided HomeLife with an estoppel certificate which read, in pertinent part, that the Lease "[had] not been modified or amended except by [an amendment not relevant to this appeal]."  Thus, J.G.M.C.J. represented to HomeLife that Paragraph 19 had not been amended.

Massachusetts common law). However, just as a surety is discharged by material changes in a contract, an original lessee can be discharged by material changes in the lease negotiated between the assignee and the lessor. See McCabe v. Arcidy, 635 A.2d 446, 453 (N.H. 1993) (noting that material alteration in principal contract without consent of guarantor discharges guarantor if the material alteration injures the interest of the guarantor).

B.   J.G.M.C.J.'s Remaining Common Law and Statutory Claims

J.G.M.C.J. next alleges a series of common law and statutory claims in an attempt to hold Sears responsible for the rent incurred by HomeLife as a result of HomeLife's exercise of the extension options. It claims that Sears:  (1) breached the implied covenant of good faith and fair dealing; (2) committed the tort of negligent representation; (3) would be unjustly enriched if excused from performance under the Extension Agreement; and (4) engaged in unfair or deceptive acts in violation of the New Hampshire Consumer Protection Act. Each of these claims, however, fails because Sears acted in full compliance with a valid, express contract, did not misrepresent its obligations under that contract, and did not act in an unfair or deceptive manner. See Centronics Corp. v. Genicom Corp., 562 A.2d 187, 190, 193 (N.H. 1989) (A breach of the common law obligation of good faith, when not related to an employment contract or contract formation, requires a showing that the defendant's "exercise of discretion exceeded the limits of

-10-

reasonableness."); <u>Snierson</u> v. <u>Scruton</u>, 761 A.2d 1046, 1049-50 (N.H. 2000) (The tort of negligent misrepresentation requires a showing that the defendant made a negligent misrepresentation of a material fact, and that the plaintiff justifiably relied on it.); <u>Tentindo</u> v. <u>Locke Lake Colony Ass'n</u>, 419 A.2d 1097, 1100 (N.H. 1980) (A claim of unjust enrichment will not lie "[w]here there is a valid express contract between the parties . . . [because] the law will not imply a quasi-contract."); <u>Barrows</u> v. <u>Boles</u>, 687 A.2d 979, 986 (N.H. 1996) (To state a claim under the New Hampshire Consumer Protection Act, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." (citation omitted)). Thus, Sears is not liable for any of the rent due under the Extension Agreement.

**<u>Affirmed.</u>**