**TEPATASI PUAILOA, Cross-Plaintiff,**

v.

**PUAILOA TAEI MA`AE, Cross-Defendant.**

High Court of American Samoa
Land and Titles Division

LT No. 27-05

October 21, 2005

Before RICHMOND, Associate Justice; SAGAPOLUTELE, Associate Judge; and SAOLE, Associate Judge.

Counsel: For Cross-Plaintiff, Sharron I. Rancourt
For Cross-Defendant, Salanoa Aumoeualogo

OPINION AND ORDER

### Introduction

Although this action was commenced as a civil action in the Trial Division, it is in fact a controversy related to land that is within the exclusive jurisdiction of the Land and Titles Division. A.S.C.A. § 3.0208(b). We have therefore transferred this case to the Land and Titles Division on our own motion.

On October 2, 1997, American Industries, Inc. ("American Industries") entered into a lease agreement with Puailoa Tavete ("Puailoa T."), former *sa`o* [head chief] of the Puailoa family, to build a warehouse and add a storage area for its business on approximately 1.08 acres of the Puailoa family's communal land in Malaeimi Valley. The rental income was purportedly assigned to Cross-Plaintiff Tepatasi Puailoa ("Tepatasi"), Puailoa T.'s son, and American Industries made the monthly rental payments to Tepatasi from October 1997 until two months after Puailoa T.'s passing on March 2, 1999. Thereafter, American

Industries put the rental payments into a separate bank account amidst its uncertainty as to whether such rent should be paid to Tepatasi, or to the successor *sa`o* for the Puailoa family, once he was duly registered. Pursuant to this Court's February 22, 2005 order, the segregated funds and subsequently accruing rent were deposited in the High Court's Registry pending our decision on who is now entitled to receive the rental funds.

The Puailoa *sa`o* title remained vacant until Cross-Defendant Puailoa Taei Ma`ae ("Puailoa M.") was judicially awarded the title in 2003.[1] As the new family *sa`o*, Puailoa M. requested that American Industries pay him all unpaid and future rent due under the lease. Tepatasi likewise contacted American Industries, objecting to the tendering of any rent payments to Puailoa M. on the basis that he, as the designated assignee, is the party entitled to the rental payments. On August 2, 2004, American Industries, prompted by the two competing claims, filed an interpleader action against both Puailoa M. and Tepatasi to: facilitate deposit into the Court Registry of all unpaid rental funds, past and future; obtain discharge of its obligation to pay further rent to Puailoa T. as the named lessor under the lease; and have the High Court determine who is now entitled to receive the rent.

Tepatasi maintains that all parties to the lease understood and intended that he would receive and continue to receive the rent. Puailoa M. maintains that Tepatasi's objection is unwarranted because rental income for leased family communal land should always be released to the *sa`o* in charge of those lands. Having reviewed the evidence presented by the parties, we conclude that the lease rents were assigned to Tepatasi, but that under the Samoan custom pertaining to assignments of family communal land to family members, Puailoa T. acted arbitrarily and capriciously by assigning the entire rental income to Tepatasi to the total exclusion of the Puailoa family. Puailoa M., as the new Puailoa *sa`o*, should be afforded the first opportunity to allocate the rental proceeds between the Puailoa family and Tepatasi in reasonable and fair proportion.

---

[1] *In re Matai Title "Puailoa"*, 7 A.S.R.3d 228 (Land & Titles Div. 2003.) The appellate court affirmed the trial court's decision on May 6, 2004. *In re Matai Title "Puailoa,"* 8 A.S.R.2d 44 (App. Div. 2004).

## Discussion

### I. The Rental Assignment in Fact

We first address Puailoa M.'s challenge to the very existence of the rent assignment. Puailoa M. argues that we must disregard the word "assignee" in the lease agreement, contending that the word was subsequently added to the original agreement using a different typewriter. In short, Puailoa M. claims that Tepatasi's assignment was grounded in fraud. He further maintains that, in any event, the word must be construed against any rent assignment to Tepatasi as a matter of contract interpretation. We disagree.

#### A. The Fraud Allegations

The only documentation of the rental income assignment is in the lease itself, where the word "assignee" is written below Tepatasi's witness signature. The added word "assignee" is clearly in a different font than the remainder of the document. However, without any direct contradiction, the evidence confirms that the addition was done without any fraudulent intent.

First, the word "assignee" was present on the lease agreement when it was recorded at the Office of the Territorial Registrar. Second, attorney Afoa L. Su`esu`e Lutu ("Afoa"), who assisted the parties during the contract signing session, consulted with Puailoa T. before the lease agreement was executed and was assured that Puailoa T. intended to assign the lease rent to Tepatasi. Before actual lease agreement execution, Afoa recommended that the parties create a formal assignment of the lease rent. However, others present, including Puailoa T., desiring to consummate the lease agreement while the proper signatories were together, wanted to simply add the word "assignee" to the lease document to effectuate the rent assignment. This was done before the lease agreement was signed. Third, Richard Ames ("Ames"), who negotiated the contract on American Industries' behalf and was also present when the lease was signed, agreed that Puailoa T. designated Tepatasi as the assignee of the lease rent. Fourth, Pua`aelo Puailoa ("Pua`aelo"), similarly affirmed that upon Puailoa T.'s signing the lease agreement, he understood that Puailoa T. intended to assign the lease rent payments to Tepatasi.

Finally, the parties conduct corroborates the witness testimony. Tepatasi did in fact receive the lease rental income during Puailoa T.'s life, and shortly after his death, without objection. Therefore, while at first blush the brevity of the language creating the assignment and the manner in which it was typed may call its authenticity into question, we are confident that the lease agreement was not altered with any fraudulent intent of the parties.

B. Contract Interpretation

Tepatasi argues that under traditional principles of contract interpretation, he is the assignee of the rent under the lease agreement and is therefore entitled to the rental payments due after Puailoa T.'s death.

A lease is a form of contract that, in the first instance, should be construed in accordance with the standard rules of contract interpretation. *J.M.G.C.J. Corp. v. Sears, Roebuck & Co.*, 391 F.3d 364, 367 (1st Cir. 2004); *Solo Serve Corp v. Westowne Associaties*, 929 F.2d 160, 164 (5th Cir. 1991). The starting point of such interpretation begins with the "plain meaning rule," holding that where the words of a contract are clear and unambiguous, their meaning should be interpreted according to their ordinary usage without reference to extrinsic facts or aids. *See Foothill Capital Corp. v. East Coast Bldg. Supply Corp.*, 259 B.R. 840, 845 (E.D. Va. 2001) (observing further that courts are not at liberty to rewrite the contractual language). Extrinsic evidence is admissible to interpret the agreement only when the words of the writing are themselves ambiguous, but cannot be used for the purpose of adding to, modifying, or contradicting the terms of a written contract. *See Connors v. Tanoma Min. Co., Inc.*, 953 F.2d 682, 685 (D.C. Cir. 1992); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 212, 214(c) (1981) (agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish the meaning of the writing, whether or not integrated).

In the present case, as noted above, the only term to be interpreted here is the single word "assignee" added below Tepatasi's witness signature. We regard the ordinary meaning of the term "assignee" as "[o]ne to whom property rights or powers are transferred by another." BLACK'S LAW DICTIONARY 127 (8th ed. 2004). While this would suggest that at least some right or interest has been transferred to Tepatasi, BLACK'S observes that "[u]se of the term [assignee] is so widespread that it is difficult to ascribe positive meaning to it with any specificity." *Id.* Thus, as is often natural with contractual terms, we must examine outside evidence and testimony regarding negotiations prior to or contemporaneous with the adoption of the lease in order to

establish what the parties intended at the time of the agreement.

■ We note that although Puailoa M. disputes that a rent assignment has occurred, he was not a party to the agreement. Once again considering Afoa's, Ames' and Pua`aelo's testimony, as well as the course of conduct followed by the parties upon implementing the agreement, the extrinsic evidence supports Tepatasi's assertion that he was assigned right to the lease rental income. It also appears that the parties themselves attached the same meaning to the word "assignee." We therefore find that the word "assignee" was intended to transfer to Tepatasi the right to receive the rental income generated from it.

■ Consequently, if this action was strictly and solely determined under standard contract principles, we would award judgment to Tepatasi. However, the case also involves Samoan customary law related to communal land and, as such, raises issues of overriding and controlling concern. *See Tavai v. Silao*, 2 A.S.R.2d 1, 2 (Land & Titles Div. 1983). This court is obligated to preserve Samoan custom. *Id.*; A.S.C.A. § 1.0202.

## II. *Sa`o's* Power to Assign Communal Land

Puailoa M.'s broadly contends that in the transactions at issue, Puailoa T. contravened and indeed threatened the very essence of the Samoan way of life. Specifically, Puailoa M. asserts that Puailoa T. exceeded his authority as the Puailoa family's *sa`o* when he assigned the Puailoa family's communal land to Tepatasi and, additionally, when he purportedly made a lifetime assignment of the American Industries lease rent to Tepatasi. We address both arguments in turn.

■ Although no one Samoan family member has more ownership rights in family owned communal land than any other, a specific family member may be assigned the use of such land by the *sa`o*, in accordance with Samoan custom. *Taesali v. Samuela*, 3 A.S.R. 359, 360 (Trial Div. 1958). Samoan custom recognizes that a *sa`o* has *pule* [power] or the right to control and administer family communal land, giving him the authority to assign a parcel of family land to a family member without a family discussion and consent prior to the assignment. *Tali v. Tupeona*, 4 A.S.R. 194, 199 (Trial Div. 1961); *Seventh Day Adventist Church of American Samoa v. Maneafaiga*, 23 A.S.R.2d 150, 154 (Land & Titles Div. 1993) ("[b]y virtue of the pule, the *sa`o* parcels out and assigns family land for the use of individual family members."); *Lutu v. Taesaliali`i*, 11 A.S.R.2d 80, 87-88 (Land & Titles Div. 1989) (*pule* includes the power to divide and allocate land to individual members for their use).

Puailoa M. questions whether Puailoa T. actually assigned Tepatasi the family land at issue.[2] In the first place, by virtue of the very nature of his position as the *sa'o*, Puailoa T. clearly had *pule* over the land. He told his children in advance that he intended to assign parcels of the family land to them for their use. Several years later, in 1985, Puailoa T. orally and separately made the intended assignments, totaling approximately 10 acres, to Tepatasi and his brothers and sister.

In questioning whether the assignment was in fact made, Puailoa M. also claims that Tepatasi and his siblings did little if anything, to develop the assigned land parcels. In fact, Tepatasi and his siblings, particularly his sister, did utilize their respective parcels for some agricultural development.[3] In any event, we are not persuaded that Tepatasi's failure to make significant use of the land for a substantial period somehow invalidates his 1985 assignment.

A *sa'o's* authority over family lands cannot be exercised unreasonably or unjustly and must benefit the entire family. *See e.g., Fairholt v. Aulava,* 1 A.S.R.2d 73 (Trial Div. 1983). However, there is no indication that the communal land assignment in this case was not a just and fair exercise of those powers. Indeed, as Tepatasi maintains, it appears the land assignment was done in recognition of his assistance to his father and family in the past, and specifically, in helping regain approximately 300 acres of original Puailoa family lands in the Malaeimi Valley. *Reid v. Puailoa,* LT No. 7-79 & 41-79 (Land & Titles Div. 1982), *aff'd in part* and *rev'd in part,* 1 A.S.R.2d 85 (App. Div. 1983), *aff'd sub nom, Corporation of the Presidiing Bishop v. Hodel,* 637 F. Supp. 1398 (D.D.C. 1986), *aff'd,* 830 F.2d 374 (D.C. Cir. 1987), *cert. denied,* 486

---

[2] We point out that Puailoa M. was residing outside of American Samoa at the time of these events. Moreover, he and Puailoa T. were distant relatives within the Puailoa family, and even if Puailoa M. was here, he would not necessarily be privy to Puailoa T.'s communal land assignments.

[3] Tepatasi did not use his assigned communal land for any truly significant economic benefit until the opportunity to lease a portion of the land to American Industries came along. Puailoa T. and American Industries entered into their lease agreement in 1997. Puailoa T., as the guardian of the title to the leased family communal land, was the proper person to execute the lease, even though Tepatasi was assigned the land to use for his benefit. *Haleck v. Tiumalu,* 3 A.S.R. 380 (Trial Div. 1959). That Puailoa T. was a signatory to the lease did not, as a matter of Samoan custom, invalidate the original land assignment or preclude assigning the rent payments to Tepatasi. This is not to say, however, that the amount and duration of the rental income assignment survives scrutiny.

U.S. 1015 (1988). And while communal land assignments to a *sa'o's* children may warrant greater scrutiny, *see Gi v. Temu,* 11 A.S.R.2d 137, 142 (Land & Titles Div. 1989); *Talili v. Satele,* 15 A.S.R.2d 5, 8 (Land & Titles Div. 1990), Puailoa T. only assigned approximately 10 acres of the 300 recovered acres to his children. Moreover, Tepatasi's assignment was only one of the many Puailoa T. made of the family's communal land. We hold, therefore, that the assignments of family land to Tepatasi and his siblings were not demonstrably arbitrary or capricious.[4]

## III. The Rental Income Assignment

■ Although we regard the *land assignment* to Tepatasi as made within Puailoa T.'s authority, we must still address the question of whether the *rent assignment* for the entire term of the lease was excessive and reached the point of being arbitrary and capricious in derogation of applicable Samoan custom. We hold that it was.

Puailoa T.'s favoritism towards Tepatasi effectively and completely deprived the Puailoa family of a significant source of income derived from a valuable family asset for a substantial time period, i.e., the term of the lease or 30 years initially and potentially a total of 55 years if American Industries exercises its option to renew the lease for an additional 25 years. Under the rent assignment, Tepatasi would presently receive $933.33 per month and, given the automatic rent increases every five years during the original 30-year term, $1,600.00 per month during the last five years. During the 25-year option period, the rent goes to $1,900.00 per month for the first five years, with negotiated increases for each of the following four five-year periods. Thus, viewed solely in contractual terms, Tepatasi and his heirs stand to potentially receive $425,996.60 from the lease rents during the original 30-year lease term and, disregarding negotiated increases, at least another $570,000.00 during the 25-year option lease term.

In light of the above facts, we hold that Puailoa T.'s rent assignment to Tepatasi exceeded reasonable bounds and was therefore arbitrary and capricious. Control of valuable family land under the communal land system is at the very heart of the Samoan way of life. Diverting rental profits from family interests to individual self-interests by long-term leases of family land dilutes the purposes and strength of the communal land system.

---

[4] In fact, were we to agree with Puailoa M. and reject Puailoa T.'s land assignment power, Puailoa M. would have us inappropriately undermine his own *pule,* as predecessor *sa'o,* over the family's communal lands.

■ This is not to say that Tepatasi should be deprived of a reasonable and fair share of the lease income. However, Puailoa M., as the present *sa'o*, is best positioned to determine a proper allocation of the rent income between Tepatasi and the Puailoa family. This determination must be made according to Samoan custom and arrived at only after consultation with Puailoa family members, including Tepatasi. *See Talili v. Satele*, 4 A.S.R.2d 23, 27-28 (Land & Titles Div. 1987); *Talili, 15 A.S.R.2d* at 8. We will therefore afford Puailoa M. a reasonable opportunity, in the first instance, to use his *pule* to solve the rent assignment issue with a fair and equitable allocation of the rent proceeds between Tepatasi and himself for the whole Puailoa family's benefit. We will intervene further only if Puailoa M. is unable to achieve that result.

### Order

Because we regard as lease rent assignment to Tepatasi as an arbitrary and capricious decision by Puailoa T., we presently set aside the rent assignment. Puailoa M., as the current *sa'o*, shall determine, after consultation with the Puailoa family members, including Tepatasi, a fair and reasonable allocation of the rental income. We hope that Puailoa M. can amicably resolve the controversy. We will further intervene in that determination only if Puailoa M. is unable to reach a fair and equitable result. It is so ordered.