James E. RAND

v.

Henry SIMONDS et al.

No. 04 CV 382 JD.

United States District Court, D. New Hampshire.

March 22, 2006.

James E. Rand, Concord, NH, Pro Se.

Michael A. Pignatelli, Rath, Young & Pignatelli PA, Nashua, NH, Kenneth C. Bartholomew, Rath, Young & Pignatelli PA, Concord, NH, John A. Curran, Getman, Stacey, Schulthess & Steere PA, Bedford, NH, for Defendant.

### ORDER

DICLERICO, District Judge.

James E. Rand, proceeding pro se, has sued three present or former employees of the Merrimack County House of Corrections (the "MCHC"), alleging that they were deliberately indifferent to his medical needs during his prior detention in that facility. One of the defendants, Henry Simonds, has moved for summary judgment on the ground that Rand failed to exhaust administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("the PLRA"). Through separate motions, Simonds also seeks dismissal of Rand's case (1) as a sanction for his failure to provide certain interrogatory responses despite a court order and (2) for failing to disclose an expert witness to testify in support of his claim.

The other defendants, Carole Anderson and Richard Doucet (the "supervisory defendants"), have separately moved for summary judgment on the basis of Rand's failure to exhaust administrative remedies. They also seek summary judgment on the independent grounds that Rand cannot prove they were deliberately indifferent to any serious medical need on his part and that they enjoy qualified immunity. Finally, the supervisory defendants have filed a "supplemental motion for summary judgment" arguing that Rand cannot succeed on his claim without expert testimony, which he has failed to disclose by the court-imposed deadline. Rand has not responded to any of the defendants' motions, despite having been granted an extension of time to do so.[1]

### Background

Rand entered the MCHC on February 13, 2004, following "a high speed car chase that ended with [his] losing control of his vehicle [and] crashing into trees." Compl. ¶ 7. At that time, as well as during all of the events at issue here, Anderson was the superintendent of the MCHC, while Doucet was the assistant superintendent. Before going to the MCHC, Rand was transported from the scene of the accident to Concord Hospital, where he underwent x-rays and other testing. As a result of this "very brief exam," Rand was diagnosed as being "in good medical health," aside from some minor cuts and bruises. Id. ¶ 9.

Phyllis Butler, a nurse at the MCHC who also serves as the head of its health services department, first examined Rand on February 14, 2004. She noted that he complained of muscle soreness in his neck and back as a result of the accident but otherwise described his "General Health"

---

1. Although Rand's time to respond to Simonds's motion to dismiss for failing to disclose an expert witness, and the supervisory defendants' supplemental motion for summary judgment, has yet to run, those motions are moot, for reasons which will appear.

as "good." Butler Aff. ¶ 9. Consistent with the orders he received upon his discharge from Concord Hospital, Rand continued to treat his soreness with Tylenol for a few days. On February 17, 2004, however, he requested medical attention for swelling he noticed in his back near his right shoulder. The nurse who examined Rand found no swelling, but prescribed ibuprofen and a muscle relaxant. The next day, Simonds, a physician's assistant at the MCHC, added Ultram, an analgesic, to Rand's drug regimen.

Rand asked for further medical attention on February 23, 2004. Simonds, who saw Rand the next day, told him "that the soreness and pain was normal after getting involved in a car accident" and suggested that he continue to treat those symptoms with Ultram. Compl. ¶ 22. In a follow-up appointment on February 27, 2004, Rand reiterated his complaints of pain in the area of his right shoulder. Noting "no external sign of injury" and a "full range of motion," Simonds diagnosed Rand with a muscle strain secondary to the accident and renewed his prescriptions for ibuprofen, Flexeril, and Ultram. Butler Aff. ¶ 12. Rand alleges that Simonds "couldn't provide an explanation for the problems [Rand] was having" and should have referred him to a specialist at that point. Compl. ¶ 31.

Just over a week later, on March 8, 2004, Rand again sought medical attention, complaining that he could not raise his right arm and that he had heard a popping noise in his right shoulder. Patricia Lee, the physician's assistant at the MCHC who saw Rand at this time, observed that he could not lift his right arm more than

ninety degrees or extend it behind his back. She diagnosed Rand with a rotator cuff tear and ordered him to continue taking Tylenol and Ultram. According to Rand's medical chart, Lee also "suggested" that he consult with an orthopedist with a view toward possible surgery. Butler Aff. ¶ 14.

Anderson subsequently discussed Lee's "recommendation" with Butler, "who believed a more conservative approach, with use of prescriptions and passage of time, would better assess the complaints." Anderson Aff. ¶ 12.[2] Although both Anderson and Butler have submitted detailed affidavits in support of the supervisory defendants' summary judgment motion, neither claims to have spoken to Lee about her "recommendation" that Rand see an orthopedist, or the reasons for it. Furthermore, Anderson recalls that she and Butler "discussed having Dr. Rodd, the jail's physician and medical director, review the case," *id.*, but neither Anderson nor Butler indicates whether this in fact occurred.[3] On March 11, 2004, however, Butler entered a note into Rand's chart stating, "Will hold off on surgical consult for now—awaiting court rulings/court dates." Butler Aff. ¶ 15.

Butler saw Rand again on March 19, 2004, when he sought attention for complaints of increased pain in his right shoulder, accompanied by occasional pain and numbness in his right arm and hand. Butler "told him per jail policy this pre-existing condition will not be authorized for surgical intervention" and, in response to his requests for "at least an x-ray or [to] have the shoulder scoped to find out if

---

**2.** All citations to "Anderson Aff." refer to the amended affidavit she filed in support of the supervisory defendants' motion for summary judgment.

**3.** Doucet recalls that Anderson "advised [him] to confirm for the medical department that Mr. Rand would not be transported for an outside consultation at that time," which Doucet did. Doucet Aff. ¶¶ 7–8. Doucet provides no further details in this regard.

it is a rotator cuff tear, told him he would have to write directly to Carole Anderson for authorization ...." *Id.* ¶ 16. Butler encouraged Rand to keep taking the prescribed drugs for his pain, but he protested that they were ineffective and expressed concern over "liv[ing] on pain medications the whole time I'm here." *Id.*

Anderson attests that Rand never made a "formal request" to her to authorize the treatment he desired. Anderson Aff. ¶ 13. He had, however, submitted a medical request slip on March 12, 2004, "about discomfort in his right arm and whether he would be referred to a specialist for examination (as mentioned by PA Lee)." *Id.* ¶ 15. In addition, on June 10, 2004, Patricia Moyer, an investigator for the public defender representing Rand on the criminal charges against him, telephoned Doucet, the MCHC's assistant superintendent, "about Mr. Rand's medical care at the jail," specifically his complaints of pain in his shoulder. Doucet Aff. ¶ 11. Doucet summarized his conversation with Moyer in a letter he sent her later that day, stating:

> As I explained to you, this is a pre-existing condition and if [Rand] has insurance or funds to cover the cost of the exam he is requesting, we will make the necessary arrangements. There is no doctor's order for a surgical consult with orthopedics; there is only a recommendation by Physician Assistant Patricia Lee.

*Id.* ¶ 12. Moyer wrote to Anderson on both July 26, 2004, and December 8, 2004, requesting, *inter alia,* "a copy of the jail's policy for non-treatment of pre-existing conditions." Mot. J. Defs.' Ans. Admis., Ex. F, at INM 000111, MED000055; *see also* Anderson Aff. ¶¶ 20, 22. Meanwhile,

Rand commenced this action on October 7, 2004. On December 13, 2004, Anderson sent a letter to Rand, with a copy to Moyer, stating, "[o]ur policy regarding medical occurrences is that we do not treat conditions that do not require treatment. However, we do treat any condition that needs treatment." Anderson Aff. ¶ 24.

Neither Anderson nor Doucet had explained the MCHC's medical care policy with reference to the language set forth in the inmate handbook then in effect. Under that policy, "[n]o inmate [could] be refused necessary medical treatment for financial reasons." Anderson Aff. ¶ 7, Ex. A, at 7. The handbook defined "necessary medical treatment" as

> [a] professional judgment made by a Physician Assistant that the requested service or medication is medically appropriate and cannot be safely and humanely postponed until after the inmate's period of incarceration ends. Treatment that the Staff Physician deems to be elective may be refused on the grounds that it is not medically necessary.

*Id.* Notably, this policy gave neither the administration nor the head of the health services department any role in deciding what constituted "necessary medical treatment," but left that determination to a physician's assistant, subject to the approval of the staff physician. Nor did it mention, as a factor in determining whether care for a condition was medically necessary, whether it predated the inmate's arrival at the MCHC.

In any event, when Lee examined Rand on November 11, 2004, she noted that his "rotator cuff tear [was] much improved" and that his right shoulder showed "no crepitus and a much more flexible range of motion."[4] Butler Aff. ¶ 29. This was the

---

**4.** Crepitus, in the relevant sense, is "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." *Dor-*

only time Rand sought medical attention for his shoulder between March 19, 2004, and December 9, 2004. By that time, Rand had provided Lee with additional records of his visit to Concord Hospital on the night of his arrest, which indicated a possible cervical injury. Lee then scheduled a CT scan of Rand's cervical spine and, upon getting the results, made an appointment for Rand for evaluation by an orthopedic surgeon.

On January 14, 2005, Rand saw Dr. Russell Brummett, who diagnosed him with "[p]osttraumatic cervical strain with previous C5 injury." Butler Aff. ¶ 44. Noting that "this is something that should be treated very conservatively" and that Rand did "not present with any particular risk for any neurologic injury," Brummett "recommend[ed] a physical therapy regimen . . . ." *Id.* Rand subsequently received physical therapy from an outside provider on a number of occasions in January and February, 2004. Through this regimen, Rand "made good progress with increas[ing] mobility and strength," but "minimal progress with decreasing pain/discomfort," in his right shoulder. *Id.* ¶ 56.

Rand saw a different orthopedist, Dr. FitzMorris, on February 23, 2004. FitzMorris did not "appreciate any acute cervical spine injury related to [Rand's] motor vehicle accident," adding that Rand's "insight [was] poor" and that "[s]urgery [was] certainly not the answer." Butler Aff. ¶¶ 58–59. Instead, FitzMorris suggested a decrease in Rand's Ultram intake and additional exercises.

On March 31, 2004, Rand discussed increasing his medications and getting a "possible third opinion" with a nurse at the

MCHC. Butler Aff. ¶ 64. Lee, following a consultation with Rodd, the jail's medical director, referred Rand to FitzMorris for another evaluation of his right shoulder and cervical vertebrae. Rand underwent an MRI on the shoulder on April 27, 2005, which did "not suggest a complete tear" or "recent bony injury" but rather "[a]rthritic changes." *Id.* Upon review of the results, Lee concluded that the "MRI show[ed] no obvious injuries including tears." *Id.* ¶ 71. After FitzMorris examined Rand again on May 18, 2005, the doctor agreed that Rand "had essentially a normal MRI scan" and no "significant rotator cuff tear." *Id.* ¶ 75. FitzMorris again "recommended that [Rand] wean himself from any analgesic medication and start using the shoulder more and more," but did "not recommend surgery or any other significant orthopaedic intervention." *Id.* Thus, while Rand continued to receive treatment for his shoulder pain from the MCHC medical staff over the next several months, it consisted primarily of tinkering with his medications, without further testing or consultation from outside providers.[5]

After reviewing the complaint in this matter under 28 U.S.C. § 1915A and L.R. 4.3(d)(2), the magistrate ordered that Rand be allowed to proceed on his claim (1) that Simonds was deliberately indifferent to Rand's "severe shoulder injury and related pain" by failing to refer him to a specialist or other physician in February, 2004, Order (Feb. 10, 2005), at 8–9, and (2) that Anderson and Doucet were similarly indifferent in their "tacit condonation" of Simonds's alleged misfeasance and their refusal to authorize the treatment Lee had recommended. *Id.* at 11. None of the parties objected to the magistrate's order.

---

land's *Illustrated Medical Dictionary* (30th ed.2003), at 433.

**5.** Rand did, however, resume physical therapy with an outside provider on November 30, 2005, though it is unclear for how long.

## Standard of Review

On a motion for summary judgment, the moving party has the burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant does so, the court must then determine whether the non-moving party has demonstrated a triable issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *E.g., J.G.M.C.J. Corp. v. Sears, Roebuck & Co.*, 391 F.3d 364, 368 (1st Cir.2004); *Poulis–Minott v. Smith*, 388 F.3d 354, 361 (1st Cir.2004). The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

■ Although Rand has not filed any objection to the defendants' summary judgment motions, the court cannot grant them on that basis alone. Instead, "it must assure itself that the moving party's submission shows that 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *NEPSK, Inc. v. Town of Houlton*, 283 F.3d 1, 7 (1st Cir.2002) (quoting Fed.R.Civ.P. 56(c)).

## Discussion

I. *Whether Rand Exhausted His Administrative Remedies*

■ Both Simonds and the supervisory defendants move for summary judgment on Rand's claim on the ground that he failed to exhaust his administrative remedies as required by the PLRA. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under ... any ... Federal law, by a prisoner ... until such administrative remedies as are available have been exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or a particular episode, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Rand's claim therefore falls within the ambit of the PLRA's exhaustion requirement. *See, e.g., Witzke v. Femal*, 376 F.3d 744, 751 (7th Cir.2004).

■ Where section 1997e(a) applies, but the plaintiff has nevertheless failed to exhaust available administrative remedies prior to bringing suit, his or her claims must be dismissed without prejudice. *Medina–Claudio v. Rodriguez–Mateo*, 292 F.3d 31, 36 (1st Cir.2002). The First Circuit follows the majority rule treating nonexhaustion as an affirmative defense, placing the burden on the defendant to prove that a plaintiff failed to exhaust available administrative remedies. *Casanova v. Dubois*, 304 F.3d 75, 77 & n. 3 (1st Cir.2002); *Goodrich v. Rouleau*, 2003 DNH 48, 2003 WL 1392433, at *2 (D.N.H. Mar.20, 2003). Whether an inmate has done so presents a question of law, although the answer may depend on disputed factual issues. *Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir.1999); *see also Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir.2003).

■ The defendants point out that Rand never complained about their alleged indifference to his serious medical need by filing a grievance as contemplated by the inmate handbook. Under the heading

"Grievance Procedures," the handbook in effect during the events at issue here stated:

> Inmate's [*sic*] incarcerated at the Merrimack County Department of Corrections have the right and opportunity to submit grievances to the county authorities as well as other officials of the State of New Hampshire without fear of adverse actions. The inmate grievance procedure is a formal method for resolving "misinterpretations" and/or "misapplications" of rules or alleged violations of Department Policy & Procedures.
>
> Officers will supply the necessary paperwork or information to any inmate that seeks to submit a grievance. The Assistant Superintendent will then assign the appropriate personnel to the investigation of the grievance and respond back in writing to the inmate.

Anderson Aff. ¶ 7, Ex. A, at 27. The defendants read this passage as giving "instructions" with which Rand was "required to comply" in order to exhaust the administrative remedies available to him within the meaning of the PLRA. Mem. Supp.Super. Defs.' Mot. Summ. J. at 6–7. The court disagrees.

■ It is generally true that "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place ... the prison's administrative rules require." *Pozo v. McCaughtry,* 286 F.3d 1022, 1025 (7th Cir.2002). Here, however, the "rules" on grievance procedures set forth in the inmate handbook did not appear to "require" that a grievance take any particular form. Instead, the handbook described the inmate grievance procedure as "*a formal method*" of resolving complaints and informed inmates that they "have the right and opportunity to submit grievances to the county authorities ...." (emphasis added). The handbook, then, did not fairly suggest that the grievance procedure was the only way, or even the correct way, for inmates to complain about their treatment at the MCHC.[6]

Furthermore, in the "Medical Procedures" section, the handbook in effect at the relevant time stated simply that "[a]n inmate requesting medical services shall submit a signed Medical Request Form" and that "[a]ny disputed charges may be appealed in writing to the superintendent within three days, excluding weekends and holidays," without making clear how these requirements intersect with the grievance policy. Anderson Aff. ¶ 7, Ex. A, at 8. Rand did submit a medical request form, on March 12, 2004, asking to be referred to a specialist in accordance with Lee's advice.

Courts have not held inmates to the purported requirements of prison grievance procedures which are not clearly spelled out in the applicable regulations or elsewhere. *See Spruill v. Gillis,* 372 F.3d 218, 233–34 (3d Cir.2004) (ruling that inmate's failure to request monetary relief in grievance did not constitute non-exhaustion where prison regulation stated that grievance "may" include such a request; "[n]othing in the Grievance System Policy would have put [him] on notice that he had to ask for money damages—or any particular form of relief at all"); *In re Bayside Prison Litig.,* 190 F.Supp.2d 755, 771 (D.N.J.2002) (denying motion to dismiss for non-exhaustion, though inmate did not file grievance in accordance with prison procedure, where "handbook creates the clear impression that use of ... procedure is optional, not mandatory"); *accord Giano*

---

**6.** Similarly, the grievance form itself simply contains spaces for the inmate to write his name, the date, and the "Nature of Grievance," together with additional blanks to be filled in by prison officials. Mem. Supp. Simonds Mot. Summ. J., Ex. E.

*v. Goord*, 380 F.3d 670, 678–79 (2d Cir. 2004) (treating inmate's failure to file grievance over allegedly unfair disciplinary proceeding as "justified" where prison directive described outcome as non-grievable). Relatedly, this court and others have recognized that prison officials may prevent an inmate from utilizing an administrative remedy—making the remedy not "available" within the meaning of section 1997e(a)—by telling the inmate that his complaint can be grieved only through another avenue. *See Beltran v. O'Mara*, 405 F.Supp.2d 140, 154 (D.N.H.2005) (citing cases).

Here, when Butler told Rand that his shoulder injury would "not be authorized for surgical intervention," she did not refer him to the grievance procedure, but "told him he would have to write directly to Carole Anderson for authorization ...." Butler Aff. ¶ 16. Although Rand did not explicitly request "authorization" from Anderson in response, Moyer, the investigator for Rand's criminal defense attorney, subsequently challenged the MCHC's refusal to refer him to an outside provider in a telephone conversation with Doucet, the assistant superintendent. Moyer also wrote directly to Anderson, on Rand's behalf, questioning the MCHC's stated policy of refusing to treat inmates for pre-existing conditions.

■ The overarching purpose of the PLRA's exhaustion requirement is to "afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524–25, 122 S.Ct. 983. Moyer's communications questioning the denial of outside care to Rand gave the supervisory defendants just such an opportunity. Moreover, they took advantage of the opportunity, responding to Moyer with explanations of the decision, rather than rejecting her inquiries as improper because they did not take the form envisioned by the inmate grievance policy.[7] In light of these circumstances, and the conflicting guidance found in the inmate handbook and Butler's advice as to how Rand should have complained about his medical treatment, the fact that he did not file a formal grievance on the subject is irrelevant. To paraphrase the Third Circuit, section 1997e(a) did not require Rand to "jump through any further administrative hoops to get the same answer" to his complaint from the very same administrators. *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir.2000). The court concludes that Rand administratively exhausted his claim of inadequate medical care against the supervisory defendants.

■ Simonds, however, separately argues that the claim against him could not have been exhausted through Moyer's communications with Anderson and Doucet. Rand alleges that Simonds was deliberately indifferent in failing to refer him to a specialist outside the jail for his shoulder injury in February 2004. As Simonds points out, this occurred before Lee's recommendation that Rand receive outside care for his shoulder and the subsequent decision against providing that care. It was that decision, rather than Simonds's alleged failure to recommend outside care at an earlier time, which Moyer challenged in her correspondence with the supervisory defendants.

---

7. Some courts have held that an inmate's failure to comply with applicable grievance procedures in complaining about his treatment amounts to non-exhaustion only if his grievance is rejected on that basis. *E.g., Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005); *Griswold v. Morgan*, 317 F.Supp.2d 226, 230 (W.D.N.Y.2004). Given the other reasons not to hold Rand to the requirements of the MHCH grievance policy in this case, the court need not decide whether to take such an approach here.

■ As this court recently observed, while section 1997e(a) does not itself require inmates to " 'lay out the facts, articulate legal theories, or demand particular relief,' " in registering their complaints at the administrative level, they must nevertheless " 'provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.' " *Beltran,* 405 F.Supp.2d at 151 (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002), and *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004)). Moyer's complaints to the supervisory defendants about the denial of outside care for Rand's shoulder injury, insofar as the summary judgment record indicates, did not allege any misfeasance on Simonds's part, or even mention him, by name or otherwise. Those complaints, then, did not provide the defendants "sufficient notice of [Rand's] concerns [over Simonds's treatment] to have been able to deal with them administratively." *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005). Because Rand did not administratively exhaust his claim against Simonds as required by the PLRA, that claim is dismissed without prejudice. Similarly, Rand's claim against the supervisory defendants is dismissed without prejudice insofar as it arises out of their "tacit condonation" of Simonds's actions. Order (Feb. 10, 2005), at 11.

## II. *Whether There is a Factual Issue as to Rand's Claim*

■ The supervisory defendants also seek summary judgment on the ground that the record demonstrates, as a matter of law, that they were not deliberately indifferent to any serious medical need on Rand's part. "[C]laims by pretrial detainees alleging denials of medical assistance essentially turn on whether the challenged official action constituted deliberate indifference to a serious medical need." *Ma-han v. Plymouth County House of Corrs.,* 64 F.3d 14, 17 (1st Cir.1995) (internal quotation marks omitted); *see also Gaudreault v. Municipality of Salem,* 923 F.2d 203, 208 (1st Cir.1990). This test "has both an objective component (was there a sufficiently serious deprivation?) and a subjective component (was the deprivation brought about in wanton disregard of the inmate's rights?)." *DesRosiers v. Moran,* 949 F.2d 15, 18 (1st Cir.1991) (discussing test in Eighth Amendment context); *see also Mahan,* 64 F.3d at 18.

■ The supervisory defendants argue that Rand cannot establish either the objective or subjective elements of his claim, *i.e.* (1) that he had any "serious medical problem" or (2) that they were deliberately indifferent to it. Super. Defs' Mot. Summ. J. ¶¶ 4–5. As to the second point, the supervisory defendants argue in their summary judgment motion that they simply "deferred to medical providers" when they initially denied Rand outside care for his shoulder injury. *Id.* ¶ 5. But Anderson pointedly did *not* defer to Lee's advice that the MCHC provide such care.

■ Relying on the fact that Lee wrote "surgical consult/orthopedic *suggested,*" rather than *ordered,* on Rand's chart, Butler Aff. ¶ 14 (emphasis added), Anderson maintains that she "never overruled any doctor's or physician's order to transport Mr. Rand for outside care." Anderson Aff. ¶ 33. It should be noted at the outset that this distinction does not have the legal significance the supervisory defendants have attributed to it. As this court has observed, "[e]ven elective treatment recommended by a physician but not 'necessary' in life or health saving sense, may be constitutionally mandated upon a prisoner's election." *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977) (Bownes, J.). Thus, the fact that Lee only "suggest-

ed" that Rand receive an orthopedic consultation for his shoulder did not give the supervisory defendants the prerogative, to reject that suggestion outright. Indeed, "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005); *accord DesRosiers,* 949 F.2d at 20 ("deliberate defiance of prison doctor's express orders, solely for purpose of causing prisoner unnecessary pain, could transgress the Eighth Amendment").

Anderson claims that, rather than ignoring Lee's suggestion, she and Butler "determined that conservative treatment would be pursued inside the jail, prior to any orthopaedic consultations." Anderson Aff. ¶ 32. The events surrounding the decision, however, suggest that this is less of an honest explanation for the decision than a post hoc justification of it. First, neither Anderson nor Butler claims to have asked Lee about the suggested treatment before deciding that it did not amount to an "order" and therefore could be disregarded. Second, while Anderson acknowledges that she and Butler "discussed having Dr. Rodd, the jail's physician and medical director, review the case," Anderson Aff. ¶ 12, they apparently did not, even though the MCHC's medical policy at the time gave Rodd—and not Anderson, Butler, or any other administrator—the ultimate authority to decide whether a treatment was medically necessary.

Third, Butler's notations on Rand's chart do not reflect the choice of "a more conservative course of treatment" for Rand. Instead, on March 11, 2004, just after her conference with Anderson, Butler wrote, "Will hold off on surgical consult for now-awaiting court rulings/court dates." Butler Aff. ¶ 15. Fourth, and most importantly, when Butler saw Rand on March

19, 2004, she did not tell him that "a more conservative course of treatment" had been chosen for his shoulder injury. To the contrary, she said that "this pre-existing condition will not be authorized for surgical intervention" and that "he would have to write directly to Carole Anderson for authorization for outside consult." *Id.* ¶ 16. Finally, in explaining the MCHC's decision to Moyer, Doucet also relied on the fact that Rand's injury was a pre-existing condition and, as a result, the MCHC would not provide treatment unless Rand could pay for it.

 "Prison officials may not, with deliberate indifference to the serious medical needs of an inmate, opt for an easier and less efficacious treatment of the inmate's condition. Nor may they condition provision of needed medical services on the inmate's ability or willingness to pay." *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) (internal quotation marks and citation omitted). At a minimum, the evidence just surveyed creates an issue of fact as to whether the supervisory defendants denied outside care to Rand on these prohibited bases. *See Johnson,* 412 F.3d at 404–05 (reversing summary judgment for the defendants on deliberate indifference claim arising out of refusal to allow medication recommended by plaintiff's treating physician where, *inter alia,* they failed to investigate whether it would be "medically appropriate" to disregard recommendation). The court therefore cannot grant summary judgment on the ground that the supervisory defendants did not act with the requisite degree of indifference.

 The supervisory defendants also argue, however, that Rand cannot show that he had a "serious medical need," because the eventual examination of his shoulder by medical providers outside the prison showed that he did not have the

rotator cuff tear diagnosed by Lee, or, in fact, any other significant injury. The First Circuit has instructed that "[t]he 'seriousness' of inmate's needs may ... be determined by reference to the effect of the delay of treatment." *Gaudreault*, 923 F.2d at 208 (citing *Monmouth County*, 834 F.2d at 347). Under this test, a medical need is considered "serious" when the delay in treating it causes "unnecessary and wanton infliction of pain" or "a life-long handicap or a permanent loss ...." *Monmouth County*, 834 F.2d at 347 (internal quotation marks omitted).

Here, although the supervisory defendants initially refused to send Rand to an orthopedic surgeon in accordance with Lee's suggestion of March 11, 2004, he was ultimately examined by specialists outside the jail on January 14, 2005, February 23, 2005, and May 18, 2005. These specialists concluded that Rand had neither a serious cervical injury nor a significant rotator cuff tear. They also did not believe that surgery was an appropriate intervention, recommending physical therapy and a decrease in Rand's pain medication instead. Even these measures, however, did not appreciably reduce Rand's pain and discomfort, so implementing them earlier would not have measurably improved his physical condition.

The delay in getting examined by an orthopedic surgeon, then, did not cause Rand any additional pain or permanent injury. *Cf. Monmouth County*, 834 F.2d at 347. In fact, between March 19, 2004, when Butler told Rand that he could not undergo surgery or any other outside treatment on his shoulder without Anderson's say-so, and December 9, 2004, when Lee ordered a CT scan of Rand's spine, Rand sought medical care for his shoulder only once, on November 11, 2004. Even on that date, Lee reported that Rand's symptoms appeared to have im-

proved. Because the summary judgment record demonstrates that Rand suffered no ill effects from the delay in receiving outside care for his shoulder, his injury did not amount to a "serious medical need" as a matter of law. *See Gaudreault*, 923 F.2d at 208–09 (affirming summary judgment for defendants on deliberate indifference claim arising out of delay in providing medical care when doctor who eventually examined inmate "saw no need for immediate treatment," including surgery, and "counseled patience"). The supervisory defendants are therefore entitled to summary judgment on that basis.

### Conclusion

For the foregoing reasons, Simonds's motion for summary judgment for Rand's failure to exhaust administrative remedies (document no. 52) is GRANTED; Rand's claim against Simonds is dismissed without prejudice. The supervisory defendants' motion for summary judgment (document no. 54) is also GRANTED as follows: Rand's claim against the supervisory defendants, to the extent it arises out of Simonds's actions, is dismissed without prejudice; the supervisory defendants are otherwise granted summary judgment as to Rand's claim. The remaining pending motions (document nos. 53, 65, and 66) are DENIED as moot. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.